The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

The State of Florida, The Trustees of the Internal Improvement Fund, et al., vs. The Jacksonville, Pensacola and Mobile Railroad Company, et al.

1. Representing as attorney a third person not a party to a suit in proceedings against a receiver in said suit, does not disqualify such person from hearing as judge the case between the parties, when the equities of such case are independent of the rights and not connected with the case of such third person.

2. Where in an amended complaint a corporation is named a party by the plaintiff, and upon its motion it is ordered to be made a party defendant, both the plaintiff and defendant being heard upon the motion, it is too late to insist that the defendant should have intervened under the original complaint by petition to be examined *pro interessee suo* The only question, under these circumstances, is whether this party has or claims an interest in the controversy adverse to the plaintiff, or is a necessary party to a complete determination or settlement of the questions involved.

3. Under the code, an amendment of a complaint relates back to the commencement of the action.

4. It is not necessary that a party defendant should be served with process before entering an appeal from an *ex parte* order or judgment affecting his rights, if such order or judgment is the proper subject of an appeal.

5. An appeal from a final judgment under the code, when the judgment is substantially a decree in equity, brings up the whole merits of the cause and the previous proceedings generally.

6. Where facts material to the plaintiff are embraced in the issues made by the pleadings of the defendant, it is error to enter a final decree for the plaintiff without evidence, without a hearing, and without a default. So also is it error to make a final decree against a defendant upon the allegations of a complaint and *ex parte* affidavits, without service of process, without notice, and without opportunity for hearing.

7. A supersedeas operates to suspend the action and power of the inferior court in the matter appealed from.

8. A defendant cannot, through the process of injunction, be prevented from appealing in a case where, under the Constitution and laws, he has a clear right to appeal, nor should a perpetual injunction be granted without notice or hearing, which in effect determines rights involved in the issues in the cause.

14

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

9. Where a corporation is a party, it is only necessary to bring the corporation into court by service of process upon such officers as the statute directs. Subordinate agents, employees or officers are not proper parties.

10. As a general rule, a receiver appointed in a prior suit should not be displaced by the appointment of a receiver of the same subject matter by the same court in a subsequent suit. The receivership in the first suit should be extended to the second, subject to the legal and equitable claims of all parties, and the rights of the parties in each suit are substantially the same as if different persons had been appointed at the several times when such receiverships were granted. If, however, a different receiver is appointed, then, if the court has jurisdiction of the subject matter and parties, and is the same court which made the first appointment, the receiver in the first suit must deliver to the receiver appointed in the second.

11. A mortgagee has no equitable rights growing out of his mortgage lien to have a receiver of the estate of the mortgagor beyond the property embraced in the mortgage. The receivership should not be extended to other property in the possession of and claimed by third persons.

12. Where no serious injury to the property involved in the controversy can result from the delay, notice should always be given before a receiver is appointed. A case of great urgency should be made to appear to justify such an appointment without notice, and wherever an injunction or restraining order is sufficient to protect the rights of the plaintiff, no receiver should be appointed. The appointment of a manager of a line of railway is an extraordinary exercise of power. Such appointment should be made only in extreme cases clearly justifying such action.

13. Under the Constitution and laws of the State of Florida, a receiver cannot be appointed by the judge of one circuit to take possession of property in another.

This is an appeal from a judgment rendered by the Circuit Court for Duval county. The court, in the determination of this case, decided nothing as to the merits of the controversy. The points decided are mostly matters of practice, and sufficient of the record is given in the opinion of the court to show the manner in which the questions arose.

Chief Justice Randall and Mr. Justice VanValkenburg being disqualified, Judges Goss and Bryson, of the Fifth and Third Circuits, were called to sit with Mr. Justice Westcott in the cause.

*M. D. Papy* for Florida Central Railroad Company.

Reserving for the present the question as to the regularity and validity of the appointment of a Receiver *ex parte* and without notice, for consideration hereafter, I proceed in the first place to discuss the question of the alleged consolidation of the Florida Central with the Jacksonville, Pensacola and Mobile Railroad, which is prominently put forward in the complaint and upon which the plaintiffs seem to base much of the equity they assert.

The complaint alleges and the law of the State confirms it, that the Florida Central Railroad Company was incorporated in the year 1868. The act of incorporation, which is the fundamental law of the company, contains no provision authorizing a consolidation. It is, not denied that the Legislature may, by subsequent act, confer authority for that purpose ; but it is insisted that an enabling act is essential, for without it railroad corporations organized separately " could not merge and consolidate their interests." Such enabling act, however, must be of a character not to impair the rights of any stockholder already acquired, and hence a provision which permits consolidation by a majority *only* will not be upheld so as to bind or affect the rights and interests of a minority.

The Legislature in 1869 passed the act to Perfect the Public Works in this State, the fourteenth section of which made it lawful for the several companies owning the roads or parts of roads from Quincy to Jacksonville, &c., by a vote of the owners *of a majority* of the stock interest, and with the consent of the owners of a majority of the stock in interest of the Jacksonville, Pensacola and Mobile Railroad Company, to consolidate with the latter company so as to become one corporation under its name.

It also provides that with like consent, " without such consolidation they are authorized to make such arrangements with reference to a common management and schedules as may be agreed on."

The inquiry at once presents itself, could the Legislature thus authorize a *majority* in interest of the stock of the Florida Central Railroad Company to consolidate with any other company, and the result of the inquiry will be found to be that no such power exists; that the act is in violation of the Constitution, which preserves all contracts and condemns all attempts to impair them.

Investigation of this question must lead to the conclusion that in the United States there can be no consolidation of the rights, privileges and franchises of two distinct corporations without the *unanimous* consent of all the stockholders, because it would impair the obligations of the contract which a shareholder enters into when he becomes a member of the corporation.

The Supreme Court of the United States have placed this subject beyond doubt in their decision in the case of *Clearwater vs. Meredith*, in which, whilst they admit the power of the Legislature to confer authority to consolidate, and declare that without it "railroad corporations separately organized could not merge and consolidate their interests," they proceed to say, that "in conferring the authority, the Legislature"—in that case—"never intended to compel a dissenting stockholder to transfer his interest because a majority of the stockholders consented to the consolidation. Even if the Legislature had manifested an obvious purpose to do so, *the act would have been illegal*, for it would have impaired the obligation of a contract."

Again: "When a person takes stock in a railroad corporation he has entered into a contract with the company that his interests shall be subject to the direction and control of the proper authorities of the corporation to accomplish the object for which the company was organized. He does not agree that the improvement to which he subscribed should be changed in its purposes and character at the will and pleasure of a majority of the stockholders, so that new responsibilities, and, it may be, new hazards are added to

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

the original undertaking. He may be very willing to embark in one enterprise, and unwilling to engage in another; to assist in building a short line railway, and averse to risking his money in one having a longer line of transit." (Clearwater vs. Meredith, 1 Wall., 39–40.)

See also the following cases, which show that no fundamental change can be made without the consent of all the stockholders: 6 Ohio, 119; March vs. Railroad Company, 43 N. H., 525–6; Stevens vs. Rutland and B. R. R. Co., 3 Vermont, 545, appendix.

Tested by the rule thus authoritatively settled, which will be found to be supported by the other authorities, the act of the Legislature of 1869, so far as it may be regarded as manifesting an "obvious purpose" to authorize consolidation by the vote of a majority, was and is "illegal," because coming under the constitutional inhibition referred to.

If it is insisted that the public have such an interest in railroads that the Legislature may provide for the consolidation of different lines by authorizing a prescribed majority to effect it, I then maintain that this can only be done by virtue of the right of eminent domain existing in the State; and when it is attempted to exert the power in condemning the minority stock, provision must be made in the law itself for just compensation to the dissentient stockholders, and that without such provision the act would be unconstitutional.

Chancellor Kent, in Gardener vs. Village of Newburgh, felt "bound to conclude that a provision for compensation is an indispensable attendant on the due and constitutional exercise of the power of depriving an individual of his property." (2 John. Ch., 167.)

I do not, however, believe that the Legislature contemplated the deprivation of any individual stockholder in any of the corporations, but that the act was simply permissive, and only intended to manifest the consent of the Legislature to the act of consolidation, without any purpose to affect the

rights of any one. So that if consolidation is accomplished in the only way in which it could be done, viz. : by the consent of all the stockholders, it could not be said to be void because by the act referred to the State consented to it.

It follows from these principles :

*First.* That the vote of the majority could not consolidate.

*Second.* That the act could not confer such power on the majority, and the attempt to do so is illegal.

*Third.* That if it is sought to sustain authority by virtue of the right of eminent domain, the act is unconstitutional, because wanting in the "indispensable attendant" of a provision for due compensation.

*Fourth.* That the consent of all the stockholders is necessary.

This review of the law would seem to settle the question, unless it can be shown by proper averments that the necessary action has been taken by the stockholders of the Florida Central Railroad to consolidate their road with the Jacksonville, Pensacola and Mobile Railroad. Such consolidation is not to be presumed, for the assent of the stockholders to any fundamental change cannot be presumed but must be proved, and to be proved must be averred. (March vs. Railroad Company, 43 N. H., 525-6.)

It being shown to be essential that all the stockholders should assent to consolidation to make it effective and legal, let us inquire if the allegations of the complaint are sufficient to justify the conclusion that the Florida Central Railroad Company ceased to exist by merger into the Jacksonville, Pensacola and Mobile Railroad Company.

Nowhere, either in the original or amended complaint, is there to be found an averment that the assent of the stockholders was given to consolidation. The allegation that the two companies consolidated, is unaccompanied by any statement showing how, when or in what manner the alleged consolidation was effected. There are many averments

which, if they do not contradict, at any rate make consolidation a very doubtful fact upon the very face of the complaint, and with the view of giving it support we find it stated as among the evidences that consolidation took place, that the Jacksonville, Pensacola and Mobile Railroad Company was in possession of the Florida Central Road—was operating it as one line with its own—had its principal offices at Jacksonville, and that Littlefield was President of the whole line, and had made and filed a certificate with the Governor that the whole line of road owned by the Jacksonville, Pensacola and Mobile Railroad Company was two hundred and fifty miles. This is stated in the original complaint on information, and no copy of the original certificate is furnished, though the State is a party plaintiff, to whose Governor it was, it is presumed, delivered.

I have shown that the assent of all the stockholders was necessary. Do any or all these allegations show that such assent was given? We affirm that they do not.

*First.* Because by the terms of the law itself the companies, without consolidation, were authorized to make such arrangements with reference to a common management and schedules as might be agreed on. (Section 14, act of 1869.) Hence all allegations in regard to common management and operation by the Jacksonville, Pensacola and Mobile Railroad Company afford no evidence of consolidation, because consistent with the law and the separate organization of each.

*Second.* Because one company, without the authority of the act aforesaid, might by agreement carry on the operations over the whole line, and it has been held that one company associating, allying and connecting itself with another in regard to traffic in which they have a common interest, does not amount to an amalgamation between the two companies. (2 Redfield, 590.)

*Third.* Because the certificate alleged to have been given by Littlefield, as President of the Jacksonville, Pensacola

and Mobile Railroad Company, can have no binding effect on the Florida Central Railroad Company, unless perhaps it could be established that its terms were known to the latter company and they assented to it, with an understanding as to its effect upon the rights of its stockholders.

The fact that the exchange of securities was made with General Littlefield establishes nothing to the point, because by the law the exchange was only authorized to be made with the Jacksonville, Pensacola and Mobile Railroad Company, of which General Littlefield was President, even for the bonds of any other company which might be tendered under the provisions of the fourth section of the act of February, 1870.

It is maintained, however, that the allegations of the complaint negative the suggested consolidation, and I refer to the many averments in regard to the stock of the Florida Central Railroad Company which could not exist if the company was extinct, and which is prayed in the original complaint to be seized by the Receiver with power to hold and vote the same, and finally that it should be sold by the Receiver under the order of the court. The original complaint also admits that the Florida Central Railroad Company kept up at least a mere formal organization of a Board of Directors. No such organization could have been kept up if amalgamation had taken place, for in such event all authority for such purpose would have ceased.

The amended complaint alleges, on information and belief, that prior to the issue and exchange of bonds, Littlefield had full consultation with parties named and other stockholders, constituting nearly all of the stock interest in the Florida Central Railroad Company, in relation to said exchange, and that full assent was given thereto. Here we have a concession that all the stock interest was not present, because it is alleged that the consultation was with nearly all. But if it had said *all* it could not alter the case, because the bonds of the Florida Central Railroad Company,

which it is said were tendered to the Governor in exchange for State bonds, might have been well issued, as provided for in the fourth section of the act of 1870, without consolidation, and could only have been issued and have been received by the Governor as the bonds of an independent and separate organization. It cannot be successfully maintained that the bonds of the Florida Central Railroad were or could be the bonds of the Jacksonville, Pensacola and Mobile Railroad, either in fact or by any construction that can be given to the law which authorized their issue. By a reference to the fourth section of the act, of February, 1870, it will be seen that its provisions not only contemplated but authorized an exchange of bonds of the State for bonds of any company owning part of the line between Quincy and Jacksonville, in aid of the Jacksonville, Pensacola and Mobile Railroad Company, in addition to the bonds of the latter company itself, for the exchange of which for State bonds provision is made in the second section of the same act. If this is not the correct view to be taken, then the fourth section is wholly inoperative, and the State was not authorized to receive any other bonds than those issued by the Jacksonville, Pensacola and Mobile Railroad Company itself. If, on the other hand, the Jacksonville, Pensacola and Mobile Railroad Company was required to own the entire line to Jacksonville, its own bonds under the terms of the second section would have been all that was necessary, and the fourth section would not have been adopted, for it would have been useless. The fact that the bonds of the Florida Central Railroad were accepted in exchange for State bonds, as alleged, at once overthrows all averments which are supposed to establish consolidation. But the amended complaint goes further, and admits that at the time of the exchange of securities it was discovered that all necessary steps to constitute a *pro forma* consolidation had not been taken. That the exchange of the securities was made by and in the name of the officers of the Jacksonville,

Pensacola and Mobile Railroad Company cannot affect the question, for those officers were the only ones with whom, by the law, the exchange could be effected, whether the bonds offered were those of one company or of both. When, then, were the necessary steps taken, if at all, to constitute a *pro forma* consolidation? The complaint does not inform us, but there are to be found in it many evidences that such steps were never taken, for it is alleged that Houstoun assumed to be the owner of a majority of the stock and had held meetings of the stockholders, claiming that the Florida Central was no part of the Jacksonville, Pensacola and Mobile Railroad, and that it was an independent road in every respect.

But in addition to this we have the allegation that E. M. L'Engle, who claimed to be a stockholder in the Florida Central Railroad Company, had filed a bill and had procured a Receiver to take charge of the road; all which allegations tend irresistibly to establish the positive dissent of at least some of the stockholders to the suggested consolidation. The prayer of the amended complaint to make the Florida Central Railroad Company a party concedes its existence as claimed by those referred to in the body of the bill, and at all events the fact that the road was in the possession of a Receiver at the instance of one of the stockholders of the company negatives the idea that the assent of all the stockholders was given to consolidation, without which consent, as has already been shown, it could not legally be effected.

If these allegations do not disprove consolidation by the assent of the stockholders, the absence at least of any averment that it was accomplished by the consent of all, leaves the question, so far as appears on the face of the complaint, to the only presumption which the law authorizes, viz.: that it *was not done at all*.

But conceding, for the sake of argument, that the bill makes a *prima facie* case for relief, it certainly does not

for a Receiver, because it is wanting in the necessary allegations to show imminent danger if the possession is not taken by the court, and assuredly is there the absence of everything, as well in the allegations as in the nature of the property, to justify the appointment of a Receiver *ex parte* and without notice.

In Blondheim vs. Moore, 11 Maryland, 364, (a leading case,) it is said that the authorities upon the subject establish the following propositions :

1. That the power of appointment is a delicate one, and to be exercised with great circumspection.

2. It must appear that the claimant has a title to the property, and the court must be satisfied by affidavit that a Receiver is necessary to preserve the property.

3. There is no case where the court appoints a Receiver merely because the measure can do no harm.

4. Fraud or imminent danger, if the intermediate possession should not be taken by the court, must be clearly proved.

5. Unless the necessity be of the most stringent character, the court will not appoint until the defendant is first heard in response to the application.

See also 1 Maryland Ch. Rep. 70 ; Lloyd vs. Passingham, 19 Ves., 59.

In the case of Verplanck vs. Mercantile Insurance Company of New York, (2 Paige Ch. Rep. 450,) the court says : " Another fatal objection to the regularity of these proceedings is that the appellants were deprived of the possession of their property, and divested of all their corporate rights, without having an opportunity of being heard, and without any sufficient cause for such a summary proceeding. By the settled practice of the court in ordinary suits, a Receiver cannot be appointed *ex parte* before the defendant has had an opportunity to be heard in relation to his rights, except in those cases where he is out of the jurisdiction of the court, or cannot be found, or where for some other reason it be-

comes absolutely necessary for the court to interfere, before there is time to give notice to the opposite party, to prevent the destruction or loss of property.   Formerly it was never done until after answer."

Again :

" In every case where the court is asked to deprive the defendant of the possession of his property without a hearing, or an opportunity to oppose the application, the particular facts and circumstances which render such a summary proceeding proper should be set forth in the bill or petition, on which such application is founded.   Oglevie's affidavit in this case, that he was satisfied of the necessity of such a proceeding, was not sufficient.   He should have stated the facts on which his opinion is based, to enable the court to judge of its correctness."

See also the case of The People vs. Norton, (1 Paige Ch. Rep. 17,) where the rule is laid down and the circumstances under which a departure from it is allowable.   (Trubert vs. Burgess, 11 Maryland, 456 ; Haight vs. Burr, 19 Maryland, 134 ; 13 Florida, 359.)

In view of these authorties and the principles therein announced, the order for a Receiver was erroneous, and should be reversed, because granted *ex parte* and without notice. The Florida Central Railroad Company was, by the amended complaint, asked to be made a party, and as the allegations showed that it was claimed to be an independent organization asserting rights, it was entitled to notice, and an opportunity of being heard.

It is objected that the order for a Receiver granted on filing the original complaint was never revoked, because it is not competent to do so except by order in the identical case in which it is granted.

If this proposition were true, it would be impossible for a Receiver to be displaced at the instance of a person not a party to the original record, however much he might be entitled to it by the exigencies and justice of his case, and the

court could be made the instrument of wrong without the power of relieving itself. Surely the same court that appoints is competent, in a proper case and with the proper parties before it, to displace a Receiver, though the order may be made in a different cause, otherwise it might be emasculated of its powers by the mere form of proceedings. In any proper case, which shows that its order for a Receiver over a given subject was improper, it is not seen that there can exist any principle to prevent it from displacing its own officer. The Receiver is not the officer of the case in which he is appointed, or of the parties, but he is the officer of the court that appoints him. Hence, whenver the court of which he is an officer adjudges that he is improperly in charge of property to which a third party has better right, the power to displace him must surely reside in the tribunal from which he derives his existence. How else, it may be asked, could the court act, whenever it appears that as against all the parties in the original cause, a third, having a prior or superior right, is entitled to such displacement? As a fact, Mr. Greeley was by order removed or displaced as Receiver of the Florida Central Railroad by the same court that appointed him, and the test of the power of the court was to be found in its ability to enfore it upon its own officer. The citation from 2 Wallace, 632, does not controvert this proposition, but on the contrary it is believed that it sustains it. As well may we urge that the order removing Baker and restoring Greeley was void, because not made in the case in which Baker was appointed. Where would this argument end? The case in 2 Wallace decides, it is true, that the District Court of Wisconsin, not having power to make the orders referred to, the property was in contemplation of law still in the hands of the Receiver. But it will be seen by reference to that case that the court was considering and denying the jurisdiction of the District Court to exercise any power at all, because, by act of Congress, its powers had been transferred to the Cir-

214　　　　　　SUPREME COURT.

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

cuit Court, and they proceed to say that as to the citizenship of the parties, the Circuit Court, whose Receiver was in possession of the property, was the proper tribunal where litigation concerning such possession must take place, in contradistinction from a State Court, where the jurisdiction as to the parties was alleged to exist. The case which went up to the Supreme Court was not the same case in which the Receiver was appointed, but it was in the same court. I admit that a Receiver in possession cannot be disturbed without the leave of the court, but surely the court itself, in any proper case before it, may act so as to relieve and displace him by the appointment of another.

In 2 Daniel's Ch., page 1433, we find that " a Receiver appointed over property which is in possession of another Receiver, ought to obtain the special authority of the court to recover the property." This citation is given to show that there must be instances in practice where such appointments are made. Where the same court displaces one and appoints another, the authority to take on the one hand and to surrender on the other is complete and involved in one and the same order. The order appointing Greeley in the first instance being revoked, and he being displaced by the order appointing Baker as to the Central Road, his power over that road was gone, and he could not repossess himself of this road unless by a new order, which was accordingly sought for and obtained by the plaintiffs in this case.

The complaint does not allege the order appointing Baker to be void, but seeks to vacate it, and the plaintiffs are bound by their own allegations and the legal results that flow from them.

Even in regard to different courts, the principle that the court first obtaining jurisdiction of a cause has a right to decide every issue arising in its progress, is subject to various modifications and limitations. Thus in the case of Buck vs. Colbath, 3 Wall., 345, the Supreme Court of the United States, referring to this rule, say :

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

" At the same time it is to be remarked that it is confined in its operations to the parties before the court, or who may, if they wish to do so, come before the court and have a hearing on the issue so to be decided. This limitation was manifestly in the mind of the court in the case referred to (meaning Freeman vs. Howe, cited in the opinion) for the learned judge who delivered the opinion goes on to show that the persons interested in the possession of the property in the custody of the court, may, by petition," (as the Central Railroad Company did in this case,) " make themselves so far parties to the proceedings as to have their interests protected, although the persons representing adverse interests in such case do not possess the qualification of citizenship necessary to entitle them to sue each other in the Federal Courts. The proceeding here alluded to is one unusual in any court, and is only resorted to in the Federal Courts in extraordinary cases where it is essential to prevent injustice by an abuse of the process of the court which cannot otherwise be remedied. But it is not true that a court having obtained jurisdiction of a subject matter of a suit and of parties before it, thereby excludes all other courts from the right to adjudicate upon other matters having a very close connection with those before the first court, and in some instances requiring the decision of the same questions exactly."

" In examining into the exclusive character of the jurisdiction of such cases, we must have regard to the nature of the remedies, character of the relief sought, and the identity of the parties in the different suits."

After giving an illustration of the rule where the parties are the same in three different courts, they proceed to say :

" The limitation of the rule must be much stronger and must be applicable under many more varying circumstances when persons," (like E. M. L'Engle, for example,) " not parties to the first proceeding, are prosecuting their own separate interests in other courts."

It will thus be seen that the exclusive right of the court

having first obtained jurisdiction, as against any *other court*, is subject to limitations and modifications in favor of persons not parties to the first proceeding, and that it is not true that the first court can exclude all others, under the varying circumstances which limit the application of the principle as announced in the decision quoted.

But the suit of E. M. L'Engle was in the *same*, not another court, and the order displacing Greeley and appointing Baker was made by the same and not another tribunal that originally appointed the former. As Baker was in possession and Greeley displaced by order of the same court that appointed Greeley originally, how can it be said that the possession of the property by the court was disturbed when Baker, the new Receiver, acted under its own order; and upon what principle, it may be asked, can it be maintained that the order displacing the one and appointing the other is void when made by the same court, though in a different case, and as we must presume, with proper parties before it? The court itself was acting on its own possession by transferring it from one officer to another, and if there was error in this, it was subject to revision on appeal.

It follows, therefore, that the order of the Circuit Court of Duval county displacing Mr. Greeley and appointing Mr. Baker was legal and valid, and that the right of Mr. Greeley under his original appointment was revoked and ceased to have any validity as to the Central Railroad; that it required a further order to reinstate him as Receiver, and such further order having been obtained, is the only one which could confer authority on him, and therefore is the only order from which the appeal could have been taken.

*Right of Florida Central Railroad Company to appeal.*

Having been made a party defendant in the amended complaint upon which the order of 22d June was granted, *ex parte* and without notice, the appellant was not bound to wait for process to be served, but on being informed of

the filing of the complaint, was entitled to appear before service, which is called appearing *gratis*. 1 Dan. Ch. Pr., 560; 1 Smith's Ch. Pr., 158; 2 Maddox's Ch., 201; Waffle vs. Vanderheyden, 8 Paige, 45.

Upon appearing *gratis*, a defendant may plead or answer, or take any other legal steps for the protection of his rights, as if he had been served with process; and now that the statute allows appeals from interlocutory orders such as the one granted in this case, and a supersedeas to the same, he is as much entitled to an appeal as if he had been regularly served, for otherwise he would be deprived of the benefit of this right by the very irregularity of which he complains.

The case of Swepson *et al.* vs. Call and Baker, 13 Fla., 337, is one where an injunction was granted and a Receiver appointed *ex parte* without notice, and in which an appearance *gratis* was made, an appeal taken, and supersedeas obtained suspending the order, and restitution awarded pending the appeal. The appeal in that case was sustained and the order of the court below reversed.

In this case, before the Receiver obtained possession under the order, the appellant appeared, was admitted a party, took its appeal, and obtained a supersedeas.

It fully appears, then, that the appellant was an actual party, made so by the prayer of the amended complaint itself, as well as by the order of the court, and therefore entitled to the right of appeal, to the same extent as any other party in the cause.

In 1 Barbour's Chancery Practice, 382, it is laid down that "it is not necessary that the person who appeals should be actually a party to the record, provided he has an interest which may be affected by the decree or order appealed from. Even creditors coming in before the master under a decree have been held entitled to an appeal, although not parties to the bill, because the decree affected their interests." * * "And it has been held that if the right of a remainderman, or of any person entitled to the estate in any way, is bound

by the decree, he must have a right to appeal from it, as well as the person against whom it was made. Upon this ground it has been held, that a tenant in tail in remainder expectant, after the determination of a prior estate tail (who would not be a necessary · party ·to a suit . affecting the entailed estate against the prior tenant in tail,) has a right to appeal against the decree in that suit; and that he may file a supplemental bill for the purpose of making himself a party to the suit, in order to appeal from it."

From what has been said, I conclude that upon the face of the record, the order of the 22d June, 1872, was the only one from which the appeal could have been taken, and that it was erroneous, and should be reversed.

That there was no consolidation between the Florida Central and Jacksonville, Pensacola & Mobile Railroads.

That whether there was or not, no rights or equities grew out of it in favor of either the Trustees or the State of Florida.

The the Trustees have no rights and no claim as against the road from Lake City to Jacksonville, in any view that may be taken of the subject.

That the allegations in the original and amended complaints, and the prayers for relief, afford no ground of equity in favor of the State against the Florida Central Railroad Company or their road.

That nothing therein made it either necessary or proper that a Receiver should be appointed.

That if there had even been a *prima facie* case for a Receiver, there was wanting the necessary facts and averments to authorize such appointment without notice.

That except in special cases, to be disclosed in the bill, a Receiver is not to be appointed without notice and an opportunity given to the defendant to be heard on the motion.

The the order of 22d June ought to be reversed for want of capacity in the Judge to grant it, his functions having been suspended by the assignment of another Judge to hold

and who was actually holding the term at the time the order was granted.

That the order assigning the Judge of the Second Circuit to hold the term in Duval county was within the official power of the Chief Justice to grant it, and was, therefore, legal and valid.

That the Florida Central Railroad Company having been made a party to the suit, had the right, and was, and is entitled to all the benefits of an appeal.

*George P. Raney* for Florida Central Railroad Company and others.

*Order of June 22, 1872.*

The reversal of this order is asked by the appellant, E. M. L'Engle, in so far as the same vacates the order made in L'Engle's case vs. the Jacksonville, Pensacola and Mobile Railroad Company, *et als.*, in Duval Circuit Court, appointing James M. Baker, Esq., Receiver of the Florida Central Road.

Even admitting, for purposes of argument, that the allegations in the original complaint, and the amended complaint of June 22, 1872, justify the court in assuming consolidation, there is nothing in them sufficient to sustain the vacation of the order in L'Engle's case.

The record shows that an order appointing Baker Receiver had been made in L'Engle's case, although the order does not appear *todidem verbis*, and it further shows that this order was made subsequent to the order of Judge Gillis of March 20, 1872, in this cause, appointing Greeley Receiver of the whole road from Jacksonville westward, and prior to the above order of June 22. The amended bill states that Receiver Greeley had, on the application of L'Engle in his case, been displaced as to the Florida Central Road, and another Receiver appointed. In the prayer of the same bill Baker is spoken of as the Receiver appointed in L'Engle's suit, and the order appointing him is prayed to be

vacated. The record contains a petition of Receiver Gree- ley, complaining that Baker, the Receiver then in possession of the Florida Central, was collecting part of the freight and passage money of the Jacksonville, Pensacola and Mo- bile Road then in his (Greeley's) possession, and praying that Baker be ordered to pay the petitioner all moneys re- ceived by him arising from freight or passengers carried over the road of the Jacksonville, Pensacola and Mobile Railroad Company, from Lake City to the Apalachicola river. The record gives the order made by Judge Whea- ton June 6, A. D. 1872, on this petition, and this order recognizes and deals with Baker as Receiver of the Florida Central and with Greeley as Receiver of the Jacksonville, Pensacola and Mobile, and grants the prayer.

In view of these facts it is useless for the respondents to contend that no order vacating Judge Gillis' order of March 20, 1872, had been made. The record plainly shows that such order, so far as it affected the Florida Central, had been vacated, and that Baker had been in possession of the Florida Central as Receiver, appointed in L'Engle's case, and his possession recognized by the court and admitted by respondents. Not only is the fact of the order appointing Baker Receiver having been made apparent, but there is nothing in the record to show that it was made without no- tice, or is in anywise void. The court below being a court of general jurisdiction, this court will assume that the order was valid, unless the contrary appears from the record. An appellate court never assumes error in a lower court of gen- eral jurisdiction, but always the contrary until the error is made to appear. For this court to hold that no effect shall be given to the order appointing Baker Receiver, it must assume it to be void. In Ponder vs. Mosely, 2 Fla., 207, 267-8, it is said that "judgments of courts of general juris- diction are not considered under any circumstances as mere nullities, but as records importing verity and of binding efficacy, until reversed by a competent appellate tribunal."

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

This court must hold, we believe, that there was a legal order appointing Baker Receiver made in L'Engle's case, and that the same was in full force when the order of June 22d was made.

Again: The order of June 22, so far as excepted to above, is erroneous, and should be reversed, because the record shows that it was made without notice.

The argument of Mr. Papy shows the error of the order, so far as it appoints Receiver without notice, and it would be uncharitable to impose upon the court further discussion of the case on this point. The principle laid down by this court in the case of Swepson *et al.* vs. Call and Baker, 13 Fla., 337, *et seq.*, and Swepson vs. Commissioners Columbia county, 15 Fla., is, we think, decisive of the case on this point. There is nothing in the code changing the ordinary rules as to the necessity of notice in appointing Receivers.

2. *Order of June* 24, 1872.

The appellant L'Engle excepts to this order in so far as the same pretends to consolidate his suit in Duval Circuit Court with this case, or orders him to come in as a defendant herein.

First. It is erroneous, and should be reversed, because made without notice to L'Engle.

The code, by the provisions of which the proceedings in this cause are governed, does not expressly provide in what cases or under what circumstances notice of an application for an order shall be given to the adverse party. Section 335 provides that when notice of a motion is necessary, it must be served eight days before the time of hearing, and that the court or judge may, by an order to show cause, prescribe a shorter time. It being a general principle of law as well as abstract right and the good morals of justice that no man should be adjudged without a hearing, we may reasonably assume that there being no specific provision in the code doing away with notice, but it expressly providing what the usual notice shall be, and the practice to be fol-

lowed when shorter notice is proper, that notice should always be given in one of the ways provided by Section 335, unless there are particular circumstances made clearly to appear to the court showing that notice will defeat the purpose and effect of the relief sought, and to which the party seeking is showed to be entitled.

In Androville vs. Brown, 15 Howard, 75, and 4 Abbott, 440, cited in Wait's Code, page 845, it is said : "The code, as a general rule, requires that motions shall not be made without notice of eight days, and although the court or judge may prescribe a shorter time or even dispense with notice altogether, the power was intended to be confined to exceptional cases, and not to be exercised indiscriminately on all occasions."

Again: In Springstein vs. Powers, 4 Rob. 624, cited on the same page of Wait's Code, it is said, " an order to show cause cannot properly be made unless the papers upon which the same is founded show a reason for shortening the regular and usual time for notices." And in 1 Tiff. and Smith, pages 432, 33, the same view is advanced.

We cannot see that there is in this case anything "exceptional," nor do the papers in the cause show any reason for even "shortening" the regular and usual time for notice, and certainly none for doing away with notice altogether.

3. *Order of March* 25, 1874.

The Florida Central Railroad Company and Edward M. L'Engle as appellants in the second appeal, and Edward M. L'Engle, George R. Foster and Francis B. Papy as appellants in this appeal, except to this order and ask a reversal of the same.

This order pretends both to continue and constitute J. C. Greeley as Receiver of the Florida Central Road, and directs him to take possession of the same, &c., it recognizing the fact that it was in the possession of said Papy, L'Engle and Foster.

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

The supplemental complaint, which is one of the papers upon which this order is made, is not sworn to, nor is there any affidavit supporting it, and consequently nothing which will be found in it was entitled to any consideration from the court below, as the basis for the order. There is further nothing in the amended complaint, nor in the affidavits of Littlefield or Bisbee in any manner justifying the order, nor is there anything in the complaint justifying it. This original complaint is, we contend, supplemented and superseded by the amended complaint of June 22, and is not to be considered at all in any proceedings in this cause subsequent to the filing of the amended complaint. This order was made without notice, and should on this account be reversed on the principle announced in the case of Swepson vs. Call and Baker in 13 Fla., and Swepson vs. Commissioners Columbia county, 15 Fla. This order, we claim, must be considered as an original order appointing a Receiver, as it has been made to appear that the order of March 20, 1872, was revoked by the order in L'Engle's case, for as it affected the Florida Central Railroad and the order of June 22, 1872, was improper for reasons assigned in the first part of this argument.

4. *Judgment of April* 2, 1874.

The Florida Central Railroad Company and Edward M. L'Engle, appellants in the second appeal, and all and singular the appellants in this appeal, except to this order of judgment on the following points, and ask that the same be reversed :

First. It adjudges that the Jacksonville, Pensacola and Mobile Railroad Company is now and was the owner of the railroad from Jacksonville to Lake City at the institution of this suit, and of the corporate franchise to own and operate said road, the road of the Florida Central Company.

Second. It adjudges the Florida Central Railroad Company to be consolidated with the Jacksonville, Pensacola and Mobile Railroad Company.

. Third. It "continues" J. C. Greeley as Receiver of the railroad from Jacksonville to Lake City.

Fourth. It provides and decrees that execution, (*elegit* or *fieri facias*,) shall issue against the property of said Florida Central Railroad Company. This is the effect of the decree, as it adjudges the road of the Florida Central to be the property of the Jacksonville, Pensacola and Mobile Railroad Company, and also adjudges consolidation of the two companies.

This is in fact a final judgment made after the Florida Central Company had been made a party, as the amended complaint had prayed and had answered the amended complaint of June 22, 1872, and put in issue the allegations of the same as to consolidation. The record shows that after being made a party, the Florida Central Company demanded and received a copy of the amended complaint, and was recognized as a defendant by the complainants.

The issue of consolidation being thus raised by the pleadings, the trial should have been upon regular notice to the Florida Central Company, made in writing and served at least eight days before the trial, as provided by Section 203 of the code. Instead of this no notice of trial is given, but the Florida Central Railroad Company is adjudged out of existence, not on trial of the issues it has raised nor upon notice, but by ignoring its pleadings and adjudging the answer of another defendant frivolous. If under any conception of the law, an adjudication of the answer of one defendant as frivolous could be held as effectual against another defendant who has answered, certainly the five days' notice required by Section 195 of the code should have been given to the Florida Central Company. It was not given. Besides the absence of notice, there was no testimony in the cause proving consolidation. If any was sought to be introduced to overthrow the Florida Central Company's denial of consolidation, it should have been at a trial regularly noticed

as above stated, or before a referee duly appointed for that purpose.

Again : It will be seen that no copy of the supplemental complaint, filed March 24, 1874, had ever been served on the Florida Central Railroad Company, nor had any notice of the filing been given to this defendant, nor had it had an opportunity to answer the same. The same was filed without the permission of the court being first had and obtained. Section 127 of the code provides that it shall be done on motion, and from page 335, par. 1, (g,) of Wait's N. Y. Code and the authorities there cited, it is shown that the " one uniform mode of applying to the court for leave to file a supplemenntal proceeding established, is by motion on proper. notice or order to show cause." No notice was given to the Florida Central Company, nor to any of these appellants, nor order to show cause obtained or served.

Again : The court will find from a careful scrutiny of the amended complaint, and the unverified supplemental complaint, the affidavit of M. S. Littlefield and the other papers, which it is presumed the Circuit Judge of Duval county considered as evidence of consolidation, that the facts stated in them show that Littlefield never was the owner of all the stock of the Florida Central Company, and that there was no consolidation. There is nothing in the record that shows that the companies ever, " by a vote of a majority of the stock in interest," as the statute requires, consolidated, or that either company ever took such a. vote. Mr. Papy's argument and authorities show that no such vote would have been effectual, if taken, had the minority dissented.

The judge had no right to consider any of these papers or pleadings as evidence for the purpose of making such a decree.

Second. The reasons above given apply equally to the fourth exception as well as the first and second exceptions to this judgment.

Third. A reversal of the judgment as to the above stated

features, involves a reversal of it as to the fourth exception.

Fourth. The argument and authorities of Mr. Papy sustain the third exception to this judgment, and the reasons above given are sufficient to justify this court in reversing the judgment, if it is to be considered as a final decree continuing Greeley as Receiver to operate the road for the purpose of applying the net proceeds of the operations to the satisfaction of the decree, which it plainly is.

The decree presents the unique judicial spectacle of the obliteration of a corporation which came into court at the call of the plaintiffs, summarily adjudged out of existence without notice or proof and without a hearing, and its property declared to be and appropriated as the property of another.

5. *Order of April 12, A. D.* 1874.

The appellants in this cause except to the order of April 12, 1874, and ask its reversal.

First. In so far as it enjoins the appellants from interfering with the railroad between Jacksonville and Lake City, rolling stock, &c., either as president, treasurer, superintendent, directors, or in any capacity whatever.

Second. In so far as it enjoins the appellants and each of them from bringing any suits for the purpose of asserting any right, title or interest, either as stockholders or otherwise, into or of any part of said road or the appurtenances, &c., thereof.

Third. In so far as the same enjoins the appellants from using the name or corporate seal of the Florida Central Railroad Company in any manner, or from in any manner appearing in, pleading or defending this action, or from appealing from any order made in this cause, or any order that may be made hereafter in the name of the Florida Central Railroad Company.

Fourth. In so far as the same in any manner affects or by its terms applies to appellants.

Fifth. In so far as the same affects others named therein,

similarly to the effect specified in the first, second and third exceptions, as being had by said order to these appellants or either of them.

Were the judgment of April 2d a valid, regular judgment, rendered upon legal testimony and due notice, instead of being of the character heretofore set forth, then this order might have been proper as a means of enforcing such judgment, for had it been adjudged upon a regular hearing that the Florida Central Railroad Company was defunct, then so long as the judgment stood unreversed, or without being superceded by an appeal and supersedeas bond, or whatever was necessary to operate as a supersedeas being done, no former officer or party to the suit should be allowed to act upon the presumption of the existence of the company, otherwise the judgment would have been fruitless. The judgment of April 2d being of the character heretofore shown, it is not a basis for any such order. This order finds a fatal objection in respect to each point as to which it is excepted to, and asked to be reversed on the ground of being made without notice. If such an order could be made without notice, then courts of justice would be not the forums in which defendants could litigate their rights, but the resort of arbitary power where they are deprived of appealing to the law of the land, which presumes to say they shall not be deprived of their property without a hearing.

The principles heretofore laid down as to making orders and injunctions without notice, and the authorities cited, are referred to as necessitating the reversal of this order as to the appellants in this appeal; and the court is asked to reverse the orders and judgments in each and every respect, in so far as they affect the appellants in these two causes.

*D. P. Holland* for himself.

We hold that the Duval Circuit Court did not have jurisdiction in this action to appoint a Receiver of said railroad, which was beyond its territorial jurisdiction.

First. Because the property was realty, and no part was within the territorial jurisdiction of the Duval Circuit Court or the Judge thereof.

The jurisdiction of the Circuit Courts as to their territorial extent, is limited to the subdivisions of each circuit whereof it is composed, as prescribed in the 6th Article and 7th Section, and in the 16th Article and 3d Section of the Constitution; and that the equity jurisdiction of the Circuit Courts as to their territorial extent is limited to the circuit of each Circuit Court by the 8th Section of Article 6, where it says " the Circuit Courts in the several Judicial Circuits shall have original jurisdiction in all cases of equity."

At pages 321–2, 14 Florida Reports, Mr. Justice Westcott, for the court, says: " The Constitution restricts the jurisdiction of the several Circuit Courts to the counties named. The territorial subdivision of a Judicial Circuit are described as counties in the Constitution; a name is given to each subdivision, and the jurisdiction is necessarily limited to such named subdivision."

It was not intended by the Constitution to vest a judge with the power to act on property outside his circuit by appointing a Receiver thereon; and thus, as by the records before this court, produce mischievious litigation, and unseemingly conflict between courts.

"Where a decree is sought, which is to act on the property itself, the suit must be brought in the district in which it is located." 13 Fla. Rep., 203 ; 1 Black. C. C., 537.

" The jurisdiction of a court of equity to decree a sale of mortgaged premises depends on the locality of the land, and not on the domicil of the owner of the equity of redemption." 3 Wall., Jr., C. C.

" Equity cannot act directly on land not within its jurisdiction ; it may compel the holder of the title, who is a party before the court, to give effect to a lien." 16 Howard, 1 ; 1 Black. C. C., 537 ; 3 McLean, 358.

The acts creating the Jacksonville, Pensacola and Mobile Railroad Company, and from which all its powers, and privileges, and rights of property existed, were public acts of the State of Florida; (see Sec. 24, page 35, act to perfect the public works of the State, 1869, and the amendatory statute of 1870, Sec. 9 page 14.)

The said acts being public acts, the Judge of Duval Circuit Court was bound to take judicial cognizance of the existence, rights, privileges, locality and disabilities of the Jacksonville, Pensacola and Mobile Railroad Company, and that the railroad thereof was, by the public statutes, authorized to commence at Quincy and terminate at Mobile. And that the same was not within his territorial jurisdiction.

By the statutes of Florida the Judge of the Fourth Circuit had judicial cognizance that the Jacksonville, Pensacola and Mobile Railroad Company's Railway was not within his territorial jurisdiction.

The facts alleged in the plaintiffs' complaint showed the court that the Florida Central Railroad Company had not been consolidated with the Jacksonville, Pensacola and Mobile Railroad Company.

At the time the Receiver was appointed by Judge Gillis, an action was not commenced against the Jacksonville, Pensacola and Mobile Railroad Company; and if this is true, it follows a Receiver could not be appointed. 2 Daniels C. P. and P., pages 1422, 1426.

Section 78 of the Code says: "Civil actions in the courts of record of this State shall commence by service of the summons." Bush's Dig., 479. We have seen that the corporation had not been served with summons, but that some of the individual defendants had been served.

Section 53 of the Code, (Bush's Dig., 472,) which prescribes "when action deemed to have been commenced," only applies to the statute of limitations, &c.

In Voorhees' Code, p. 83, note b, commencement of action, he says: "The delivery of a summons to the sheriff to

be served, with an intent to have it served, is the commence-ment of an action.   But only for the purpose of defeating the statute of limitations, the mere issuing of a summons is not the commencement of an action for general purposes," citing 18 Abb., 360; 7 ib., 241; 28 N. Y., 659.

Voorhees, on the Code, p. 348, note a, on appointment, says: "A receiver cannot be appointed until a suit is com-menced, except in cases of lunatics, or where the defendant designedly keeps out of the way," and cites authorities.

So that we have shown—

1. That Judge Gillis appointed a Receiver on all the property of the Jacksonville, Pensacola & Mobile Railroad Company, when an action had not even commenced against the corporation.

2. Because the property was beyond the territorial juris-diction of the Judge of the Fourth Circuit.

3. Because there was no notice given to the defendant corporation.

The rule laid down by this court, Swepson et. al. vs. Call and Baker, 13 Fla., p. 359, as to the appointment of a Re-ceiver without notice, is: "It is insisted by the appellants that notice of the application and the appointment of a Re-ceiver should have been given, and that it is required by the rules of chancery. This is undoubtedly the general rule, but we cannot say that emergencies may not exist which will warrant the exercise of the power without notice."

Voorhees at page 348, note a, as to the appointment of a Receiver under the code, says: "He cannot be appointed without notice to the party interested, except under peculiar circumstances," and cites People vs. Norton, 1 Paige, 17, and several authorities.

We hold that "the peculiar circumstances" nor "the emergencies" which would authorize the appointment of a Receiver without notice, did not exist in this case.

1. The property is a railroad.  By the complaint it is shown to be in operation from Jacksonville to Chattahoo-

chee, Tallahassee to St. Marks, and the Monticello branch. A part of this vast property, to wit : from ·Lake City to Quincy, and from Tallahassee.to St. Marks, and the Monticello branch, is shown to have been sold by the plaintiffs for $1,415,000, and that of this purchase bid $966,000 was paid, leaving as unpaid $449,000. See clause 4, 5 and 6 of the complaint. And for this balance the plaintiffs prayed judgment for the sum of $572,000. Grant that this amount was due. The same property was sold by these plaintiffs for one million four hundred and fifteen thousand dollars, and the plaintiffs alleged that the Jacksonville, Pensacola and Mobile Railroad Company not only owned this property, but that it had acquired by consolidation sixty more miles of another railroad, to wit : the Florida Central, and had constructed twenty-two miles additional from Quincy to Chattahoochee. So that if, as plaintiffs alleged, they had a lien on all this railroad property, it was on property worth five times as much as what they said was due them. And on realty, to wit: a railroad that in its very character was permanent and capable of responding to the decree or judgment prayed for if rendered. All the trusts alleged in others which they said had no priority over them, the complaint alleges were to extend this property, and that thousands of dollars had been expended in improving the property and paying debts and extending the road.

2. They show they accepted a check for the balance of the purchase money, which check was received as cash by their agent, Swepson, and that they gave possession and delivered titles to the purchasers, who were afterwards incorporated as the Tallahassee Railroad Company, which company afterwards conveyed the railroads so sold to the Jacksonville, Pensacola and Mobile Railroad Company. They show these corporations, each and both, were not in existence when this payment and delivery of titles took place. That the corporations were created afterwards.

The plaintiffs state the agent, Swepson, who received this

check, was worth a vast property in Florida, besides the $960,000 of bonds they had received from him, to wit: the Florida Central Railroad. They do not state that it was given or drawn by insolvent parties or was worthless.

They allow corporations to be created and this property to pass from the hands of individuals to a corporation, and from that corporation to another corporation, without dissent or hindrance, or attempt to do so for three years, and then, without notice—without a summons being even served on the corporation—they obtain a Receiver on, not only this property sold, and which lay in the Second and Third Circuits, but upon all the property, real and personal, of the corporation, and not only on that which it owns, but on all that it has in possession belonging to others. (See the order appointing a Receiver.)

Is this such an "emergency," or special or "peculiar circumstances," as would authorize the appointment of a Receiver without notice?

Does it not appear that instead of being the object of the plaintiffs to proceed, according to the rules of equity practice and jurisprudence, it was a device to obtain the control and possession of this vast property, by taking it from the corporation and its officers?

This demurrer, by the code, does not waive the question of jurisdiction. Sec. 94, Code, Bush Digest, 485. "The only pleading on the part of the defendant is either a demurrer or an answer."

Section 95 declares when the defendant may demur.

Next. We hold that Judge Archibald was disqualified from granting, or giving any order whatever in this case, saving an order to have the same heard by some other Circuit Judge, and to transfer the cause, because he had been whlei an attorney consulted by the Receiver, J. C. Greeley, in this case. See the record, page 441, where the Judge refused to hear the petition of the Atlantic and Gulf Railroad Company, and transferring the cause. Hence, we hold

by the statutes of Florida, all his orders and decrees, except the order of transfer as above, are void. Act 1862; page 392, Bush Digest, § 54, § 55; p. 390 ib. § 48; p. 391 ib. § 49.

This was a petition of the Atlantic and Gulf Railroad Company to recover monies collected by said J. C. Greeley as Receiver, belonging to this corporation. See page 191. This petition was set for hearing in the referees' report by consent, (see page 199,) and was refused to be heard by Judge Archibald, and ordered to be transferred. See page 441. Yet Judge Archibald made various orders in this action, and gave a final judgment in April, A. D. 1874. By filing this bill in the Supreme Court of the United States, the plaintiffs had dismissed their action in Duval Circuit Court. The plaintiffs filed an original bill in the Supreme Court of the United States in December, 1873, against Holland, alleging the same matters as in the Duval Circuit Court action, and filing the record of that State court and this action as an exhibit.

They alleged, among other things, that Holland had at a judicial sale purchased this property, and that his purchase was void by reason of the property being; at the time of the sale at which Holland bought, in the hands of a Receiver of Duval Circuit Court, and these same plaintiffs prayed that Holland should be dispossessed of this property and perpetually enjoined from asserting any title by reason of his purchase at said sale, and that the Supreme Court of the United States should order the property to be returned to J. C. Greeley, or appoint a Receiver of that court. And the plaintiffs moved that court for a preliminary injunction and for a Receiver against Holland. Both these motions were heard by that court and refused, and the court ordered Holland in December, 1873, to report the receipts to that court, &c.

And while thus obeying the Supreme Court of the United States in a cause in that court pending on bill brought by these plaintiffs, they, dissatisfied with the decision of the

Supreme Court in their own cause, proceed to the Duval
Circuit Court, and without notice to Holland, and while he
is obeying the Supreme Court of the United States, and had
been for four months, the plaintiffs, on this supplemental
proceeding, obtain an order dispossessing Holland, perpet-
ually enjoin him and take the property out of his possession
by force, and summon him to answer for contempt of Duval
Circuit Court in this action.

Holland was a purchaser at a judicial sale of all the real
and personal property of the Jacksonville, Pensacola and
Mobile Railroad Company, made by the United States
Marshal by virtue of an execution issued from the United
States Circuit Court on the 14th December, A. D. 1872,
the sale being made on the 5th of May, A. D. 1873, while
the Jacksonville, Pensacola and Mobile Railroad Company
had pending a motion to the jurisdiction of Duval Circuit
Court, and a demurrer to the plaintiffs' complaint, which,
in short, was that the action then brought was for a debt
that this company was not responsible for, and could not be,
if it would, by the 15th Section of the Act of 1869. Neither
motion to the jurisdiction nor demurrer was decided when
Holland sold. There was no Receiver in possession, nor
had there been for months prior to Holland's seizure, levy
and sale.

The Judge of the Second Circuit had decided that the
Judge of the Fourth Circuit did not have jurisdiction to ap-
point a Receiver.

"If an execution defendant is in possession of lands at the
time of the levy, this is *prima facie* evidence of title to
authorize a sale on execution." 19 Wis. 253.

Second. Holland's rights are not liable to be taken from
him by any waiver by pleading or otherwise of the Jack-
sonville, Pensacola and Mobile Railroad Company after the
levy and sale by Holland.

The record will show that there was no waiver of juris-
diction or other matter prior to Holland's purchase in May,

1873, and even if there was by this corporation afterwards, which we deny, it could not affect Holland's title or rights to the property.

The Jacksonville, Pensacola and Mobile Railroad Company could make no consent to affect that sale by pleading or otherwise.

But if the Duval Circuit Court had jurisdiction in April, 1874, they had jurisdiction in May, 1873. But the plaintiffs saw fit, instead of summoning Holland before the Duval Circuit Court, to summon him to answer and abide by the decrees of the United States Supreme Court.

And by so doing, I hold they dismissed their action in Duval Circuit Court.

Equity abhors a multiplicity of suits. " It is against the whole policy of courts of equity to encourage multiplicity of suits." Story's Eq. pleadings, § 746, 735 ; 2 Foster, 23, (N. H.;) 1 Daniels C. P. and P., 657–9.

Plaintiffs sue Holland in the Supreme Court of the United States, pray to have him dispossessed and enjoined, and are refused by the court who orders Holland to report to that court.

Plaintiffs then dissatisfied, seek Judge Archibald, and without giving Holland any notice or serving any papers on him, dispossess him of property purchased at a judicial sale lying in the Second and Third Circuits, and perpetually restrain him from even setting up any right in any court, or claiming so to do.

Therefore we hold—

1. The Duval Circuit Court did not have jurisdiction.

2. The appointment of a Receiver was illegal and without lawful authority.

3. That there was no action commenced against the Jacksonville, Pensacola and Mobile Railroad Company when the Receiver was appointed.

4. That the complaint did not state facts sufficient to

constitute a cause of action against the Jacksonville, Pensacola and Mobile Railroad Company.

5. That by reason of plaintiffs having brought suit against Holland in the Supreme Court of the United States, they had dismissed the suit in Duval Circuit Court as to him.

8. That the judgment given on account of a frivolous answer was error.

9. That there is no equity in plaintiffs' case to warrant a decree as rendered.

10. That for these reasons the action should be dismissed.

11. That the orders and decrees rendered ought to be reversed.

·Mr. Attorney-General W. A. Cocke for the State.

The State has no interest in this suit, and should not have been made a party. The interest of the State does not require its further prosecution. The actuating cause in this suit was the desire to establish a statutory consolidation of the Florida Central and the Jacksonville, Pensacola & Mobile Railroad Companies.

The act of consolidation was unconstitutional. The railroads could not be consolidated under the acts of the Legislature. The companies must act in relation thereto, which they never did.

This suit was conceived in a fraudulent effort to obtain a decree of the court sustaining consolidation with a view of covering the fraud connected with the issuing of the four million dollars worth of bonds of the State, which had been delivered to certain agents of what was illegally styled the Jacksonville, Pensacola & Mobile Railroad in lieu of its bonds, evidently considered worthless by the State, or else it would not have attempted to give them a factitious value by exchanging them for State bonds—bonds no one pretends to consider legal or binding, and in reality being nothing more nor less than an effort at a swindle.

This suit was brought during the few weeks Lieut.-Gov-

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

ernor Day acted as Governor, by parties evidently coinciding with him, and in his interest, to sustain which they voluntarily placed themselves in the strange position of filing a bill and attempting to set forth equities therein based upon the grounds on which the same parties had successfully carried through the Assembly of the State of Florida, by a unanimous vote, articles of impeachment against Governor Harrison Reed. *Vide* Articles of Impeachment against Harrison Reed, Assembly Journal, 1872, Art. IV., p. 259.

*H. Bisbee, Jr.*, for Trustees of the Internal Improvement Fund, Appellees.

There are three appeals and three records in the case entitled as above, which, by consent of the court and counsel, are argued together.

The first appeal is by the Florida Central Railroad Company from the order dated June 22, 1872, made by Judge Wheaton upon the filing of the amended complaint.

The first error assigned is that at the time the order appealed from was made, Judge White was the only judge who could make any order in the case.

If this assignment of error is sustained, then the order appealed from is a nullity. The appellee contends that the Chief Justice could not send Judge White into Duval county to hold a part of the term. But if such power exists, under the order of the Chief Justice Judge White's power continued only during Judge Wheaton's temporary absence. The fact that he made the order is the highest evidence that he was present.

The second error assigned is that the Florida Central Railroad Company was not a party to the case when the order was made. Surely then this company could not appeal. It is only a party in its technical sense who can appeal. Code of Procedure, Sec. 269; 2 Abbott's R., 390; 2 Cal., 57; 3 Md. Ch. Decisions, 186.

In appealing from this order the appellant assumes that it

conferred new authority upon the Receiver, J. C. Greeley, over the road east of Lake City, and that the appellant was entitled to notice. On the other hand, the appellee contends that the order appealed from conferred no authority whatever upon the Receiver.

The record discloses that Greeley was appointed Receiver March 20, 1872, over the entire road west of Jacksonville; and the court is specially urged to bear in mind that the original complaint alleges that Chase and others were in possession of the road under a deed of trust made by the Jacksonville, Pensacola & Mobile Company October 2, 1871, and that the Florida Central Company was consolidated with the Jacksonville, Pensacola & Mobile Company. *Vide* original complaint, subdivisions 12, 13, 14, 16, also 17 and 18. The amended complaint also alleges the same facts more in detail.

This court must assume as true every fact which the court below had a right to assume as true, and the appellant cannot for the first time on appeal question the truth of a statement of fact. An appeal lies only to correct errors of law. Abbott's N. Y. Digest, vol. 6, p. 22; 8 Wend., 219; 10 Barb., 112.

This court then, for all purposes of this appeal, must take it for granted that consolidation had taken place, and that Chase *et al.*, Trustees, were in possession of the property under a deed of trust, which did not expire until October 2, 1873, and which deed treated the entire road as the property of the Jacksonville, Pensacola & Mobile Railroad Company.

As Chase *et al.* have not appealed, the question as to whether or not the Receiver was properly appointed, as between them and the plaintiffs, is not before this court. The main question raised is what were and are the rights of the Florida Central, assuming, for sake of argument, that there was such a company, and what were the proper judicial steps for such company to recover possession of its property, if it had any, in the possession of the Receiver?

The appellee submits that there was but one mode of proceeding known to judicial proceeding for the appellant to pursue to recover possession of its alleged property, and that was to apply to the court below by petition setting up its title to the property claimed, and praying for an order upon the Receiver to deliver up the property to it.

When a party is out of the possession of property to which he claims the legal title, and he finds a receiver in possession of it, in a suit against the parties in possession he must intervene, allege, and prove his title to be superior to the title of the party found in possession, and ask to have it delivered up to him.

If the court below denies his application, he can then appeal from the order denying it, but not before. Upon this point we cite the following authorities, and challenge judicial authority to the contrary: 14 How., 52, 60, 61, and opinions of the court and cases cited therein; 7 Paige, 513; 9 ib., 373; 3 Gordon & MacNaghton R., 104; Lord Truro's opinion cited in 14 How., 60–1; 9 Ves., 335; 6 ib., 287.

The party out of possession must pursue the above course, "although his right to possession is clear." 2 Dan. Ch. Pr., 1433; 6 Ves., 287.

A court of equity will not on such application aid a party unless he shows a right free from apparent doubt, and that he has been guilty of no negligence, but been active and vigilant in the assertion of his rights, and that he is acting in good faith. 1 How., 161, 191; 8 ib., 210; 9 Peters, 416.

Had the appellant taken this course, and intervened as it ought to have done, all the confusion, irregularity, and disorder which are disclosed by the record would have been avoided.

Now examine the course taken by the Florida Central Railroad Company, the appellant. The appellant was silent and took no steps at all to recover possession until March, 1873, when it appealed from the order of June 22, 1872. The property was out of its possession, as appears from the

record from June, A. D. 1870, to March, 1873, nearly three years. From June, 1870, to October 2, 1871, it was in the possession of the Jacksonville, Pensacola & Mobile Company. From October 2, 1871, to 20th March, A. D. 1872, it was in the possession of Chase, Gordon and Ambler, under deed of trust. From March 20, 1872, to the last of May, 1872, it was in the actual possession of J. C. Greeley, Receiver, appointed in this cause. From the last of May, 1872, to March 20, 1873, it was in the actual though irregular and wrongful possession of Receiver James M. Baker, appointed at the suit of E. M. L'Engle.

It is submitted that the silence and acquiescence of the appellant all this sime is remarkable and inexplicable. Is it possible that a party with any just claim to property would suffer it to remain in the hands of other parties for three years—especially a valuable railroad property? Surely under such a state of facts a court of equity would not order it delivered up to them without the proof of legal title beyond all doubt.

Has Receiver Greeley ever been discharged? Clearly he has not.

I need not cite authority to show that when a Receiver has been put in possession of property, he must hold that property until he is ordered to deliver it up by the court appointing him. He must obey the order appointing him until he gets another order directing him to deliver it up. No such order has ever been given.

Even an order vacating the order appointing him does not relieve him unless he is directed to deliver up the property.

There is not a word in the record to show that the order of March 20, 1872, appointing Greeley Receiver, has been revoked or vacated.

Appellant contends that the appellee has admitted by the language of the amended complaint, filed June 22, 1872, that Greeley was displaced from the possession of the road east of Lake City.

In the amended complaint it will be seen that plaintiffs alleged that Baker had been appointed Receiver at the suit of L'Engle over the road east of Lake City, and Greeley displaced therefrom.

But the very object of alleging this was to complain of it, as we do complain of it in such amended bill, and ask that Greeley may be restored to possession. Certainly a party may allege an act done without alleging that it was rightfully or legally done. Complaint alleges Baker's appointment, and that Greeley was displaced from possession, but not that it was duly or legally done. We contend that Greeley could not be regularly and legally displaced in any way other than by an order entered in this case, whereas he was actually displaced by an order entered in L'Engle's suit.

The amended complaint set forth the proceedings in L'Engle's suit, and asked that Greeley might be restored, when the court entered the order of 22d of June, 1872. This order itself states that Greeley had been previously appointed, and purports to vacate the order appointing Baker, and then proceeds to declare that Greeley shall "be held and regarded as such Receiver over the whole line of railroad," &c. Thus it plainly appears—

1. That the order of June 22d, 1872, did not appoint Greeley Receiver.

2. That it assumed the validity of the order of March 20, 1872, and that the same was still in force.

3. The order of June 22d assumed that Greeley was already the legally appointed Receiver, and that Baker was improperly put in possession, and proceeded to vacate the order appointing Baker.

4. The order of June 22d does not confer any new authority upon Greeley. It removes Baker, but does not order him to deliver up the property to Greeley even.

It vacates Baker's appointment and thus leaves Greeley free to exercise his powers under the order of March 20, 1872.

The language of the order, "shall be held and regarded as such Receiver," &c., is without legal effect. It is simply a declaration that Greeley had been previously appointed, and that all his powers as such should be respected, but did not confer any new power upon him.

5. The appellee therefore contends on this point that whether this order of June 22, 1872, is confirmed, or reversed, or declared void, as it should be, Greeley's authority still continues under the order of March 20, appointing him.

The possession of a Receiver cannot be disturbed by an order entered in another case. 14 How., 65, *et seq.;* 2 Paige's Ch., 342 ; 10 ib., 43 ; 2 Vol. Redfield on Railways, 363 ; Edward's on Receivers, p. 12.

The commencement of another suit by L'Engle to recover possession of property in possession of Receiver Greeley was a contempt of court. 14 How., 65–6–7.

The following applies to all three of the appeals, and discusses in the main the following three propositions :

*First.* That all orders made in the case subsequent to June 22, were properly made and should not be reversed.

*Second.* That the complaint and amended complaint made a proper case for the appointment of a Receiver.

*Third.* That the court below had jurisdiction whether or not the Florida Central Company was consolidated with the Jacksonville, Pensacola and Mobile Company, and that consolidation is well made out upon the allegations in the complaints.

The appellee has already shown that the Florida Central Railroad Company was not in possession of any part of the railroad when Greeley was appointed, nor when the order of June 22, 1872, was made, and now calls the attention of the court to the fact that not one of the parties who has appealed was in possession of or exercising any control over any part of the road when the Receiver, Greeley, was appointed, nor were any of them parties to the case.

It is a remarkable feature if this case, or of these cases,

that every one of the appellants got into the possession of the property without applying to the court below to deliver it up, and therefore in contempt of its authority. We have already shown by authority that a party out of possession, when a Receiver is appointed and not made a party to the case, must apply to the court, set up its title and pray for possession.

A party cannot have the sufficiency of his title passed upon for the first time in the appellate court. The latter can only correct errors of law committed by the court below.

Now the Circuit Court of Duval county has never passed upon the title of the Florida Central nor of Holland. They have never come into that court and set up their title, and it is, therefore, plain that this appellate court cannot now decide whether or not the appellants have any title worthy of protection. In other words, the whole theory of the appellees is that as between the parties, plaintiffs and defendants in possession, Greeley was properly and rightfully appointed Receiver, and all subsequent proceedings of the appellants to get possession of the road have been irregular or void, and in contempt of the order of the court below. That the orders upon Holland and L'Engle *et al.*, to deliver up possession and restraining them from interfering, were necessary to protect the Receiver in his possession.

These appellants are all trespassers and interfering claimants, and cannot question the validity of the order of March 28, 1872, appointing Greeley Receiver. 14 How., 65 ; 20 ib., 594, and cases cited.

Holland acquired what interest he has after Greeley was appointed Receiver. The sale by United States Marshal, when the property had been taken possession of by the State court, was a nullity, whether the Receiver was in actual possession or not. 14 How., 52.

It is submitted that so far as these appellants' actions are concerned, and the actions of other parties in a suit before

Judge White, these are all efforts, and should be regarded as efforts to impede and obstruct the Circuit Court of Duval county in the administration of justice and to acquire the possession of the railroad property, without applying to that court.

*Cause of Action*—The cause of action by the Trustees of Internal Improvement Fund was $472,000, the balance of purchase money due and arising from the sale of the railroad west of Lake City.

The original complaint alleges that F. Dibble and associates acquired possession, without paying this balance, by fraud, covin and collusion, and that all the parties, Littlefield and others, acquired all their interests as stockholders in the Jacksonville, Pensacola and Mobile Company with notice of the fraud, and the trustees had the clear equitable right to follow the property and subject it, its rents and profits and income, to the payment of this balance of purchase money, especially after it had been put into the possession of Chase *et al.* in trust to pay other debts and extend the railroad westward.

. Now the complaint alleges that the Jacksonville, Pensacola and Mobile was the owner of the road east of Lake City, and had included it in its deed of trust to Chase *et al.* As a railroad is an entity, the court could not appoint a Receiver over a part of an entire road, even though the lien of plaintiffs extended to but that part of the road.

Again : The plaintiffs contend that the Jacksonville, Pensacola and Mobile Company, by purchasing with notice of the fraud, subjected all its property to the payment of the balance of purchase money.

2. Cause of action is the demand of the State of $224,000 for the fraud of over-issuing that amount of State bonds. This was a demand by the State against the Jacksonville, Pensacola and Mobile Company, and a good cause of action itself.

The amended complaint sets forth two other causes of

·action, to wit : non-payment of interest on the four millions railroad bonds held by the State, and non-payment of sink-ing fund due trustees on account of Internal Improvement bonds.

With all these demands against it, the Jacksonville, Pen-sacola and Mobile Company had put all its property in the hands of trustees to pay other simple contract debts, and to extend their road westward, without making any provision to pay the plaintiffs. Both complaints allege that the Jack-sonville, Pensacola and Mobile Company is insolvent, and that there is no other way to collect plaintiffs' demands save from the railroad property and its income.

*Authority as to a proper case being made for a Receiver.* —" A Receiver will be appointed in all cases where the in-come of the estate is required to meet the incumbrances, and is at the present time being so applied as not to be legally applicable to reduce the incumbrance." Redfield on Railways, 4 Ed., Vol. 2, p. 361, Sec. 22.

And for this purpose the court will, through its Receiver, manage the affairs of the company for any length of time. Ib., 361–2.

For allegations of misapplication of the income of the road, *vide* original complaint.

Allegations of insolvency, *vide* last part of original com-plaint and amended complaint, alleged that several judg-ments have been recovered against the company, which is the best evidence of insolvency.

" Where there are no persons authorized to take charge of the affairs of a corporation, or where fraud is shown or a fund is in danger of being wasted or misapplied, a Receiver will be appointed." 2 Abbott's N. Y. Dig., 144 ; 1 Paige, 587 ; 3 Johns. Ch., 48 ; 1 Barb. Ch., 644.

" Assignment of corporate property for the benefit of par-ticular creditors is an obstruction to the rights of other cred-itors, and a good ground for the appointment of a Receiver." 12 Barb., 27.

Applying the principle of the authorities cited above, the appellee submits that a strong case was made for the appointment of a Receiver.

*Jurisdiction.*—The appellants contend that the court below had no jurisdiction on two grounds—

1. They claim that the road east of Lake City did not belong to the Jacksonville, Pensacola and Mobile, and that no part of the road west of Lake City could be reached by the Duval county court, because it was not within the territorial limits of the Fourth Circuit.

The appellee contends that the court below had jurisdiction on three distinct grounds—

1. On the ground that the whole line of road west of Jaksonville was in possession of Chase, Gordon, &c., trustees, who were operating it as one road, and as the property of the Jacksonville, Pensacola and Mobile Company.

2. Because the road east of Lake City was consolidated with the road west, or that the Florida Central was consolidated with the Jacksonville, Pensacola and Mobile Company.

3. That the court below has jurisdiction even without consolidation.

What is consolidation ? "Consolidation or amalgamation seems to imply such a consolidation of the companies as to reduce them to a common interest." Redfield on R., 2 Vol. 577.

Now it cannot be denied that possession and ownership constitute a complete title to property. The allegations of the complaints show beyond a doubt that the Jacksonville, Pensacola and Mobile Company, prior to October 1, 1871, had the actual possession, and on that day made a deed of trust of all the property from Jacksonville westward.

Now the complaint and amended complaint allege that Littlefield, in June, 1870, owned nearly all of the stock in the Jacksonville, Pensacola and Mobile Company. He, therefore, had the control of the road west of Lake City.

The complaint and amended complaint allege that Little-field, in the spring of 1870, owned 3,110 shares of the Florida Central out of 5,510 shares, the entire stock in the company. That he contracted for nearly all the remainder of the stock, and paid for all the remainder save about 355 shares.

He, Littlefield, thus acquired the title and power of controlling the possession of both roads. What did he do? Instead of running the roads separately under two distinct organizations, he created and put in possession of the whole line the officers of the Jacksonville, Pensacola and Mobile. He, therefore, had the unity of interest and possession. The complaint (amended) alleges that he purchased the stock of the Florida Central for the purpose of effecting a consolidation. Inasmuch as he did own all the stock when he wanted to exchange bonds with the State, (which was cotemporary with the purchase of the stock,) he called a meeting of the stockholders—they voted to issue bonds, the proceeds to be placed in Houston's hands to be applied to pay for the stock.

All the stockholders who sold out of course had no further interest in the railroad; they looked to their contract for their money, and nearly all the stock interest of the Florida Central became merged or amalgamated with the stock interest of the Jacksonville, Pensacola and Mobile, all being held by Littlefield. Here then was a complete reduction of both companies to one common interest.

Littlefield treated the roads as consolidated, put the same officers in charge of the entire line and kept them and a deed of trust was made. To these transactions and acts of amalgamation or consolidation no one made any objection, and for the good reason that it was for the interest of the stockholders of the Jacksonville, Pensacola and Mobile, and the stockholders of the Florida Central having sold out, and had no right or interest to object.

There was a general acquiescence of all stockholders, and

the "shortest acquiescence will estop any stockholder from objecting." Redfield on R., Vol. 2, 576.

Upon this state of facts it seems difficult to say that there was no consolidation in point of equity, just as much as if the stockholders had signed a written instrument to that effect. Consolidation followed from acts done.

Now a consolidation is the legal consequence of acts done by the corporators, (stockholders.) If the statute authorizes it and acts are done that amount to it, it is effected. It is in legal effect the surrendering up by one company of its franchises to the Legislature, and, *eo instanti*, a grant by the Legislature of those franchises to another company.

"A deed of transfer or articles of agreement has no effect whatever to pass the corporate franchises from one company to another. The transfer of corporate franchises is the legal result of acts done by the corporators by force and operation of the statute authorizing the transfer or consolidation. Such deed or articles of agreement are only evidence of those acts from which the legal result follows." 5 Clarke's Iowa R., 357; 22 Ohio R., 412, 428, 429; 16 Ind. R., 172; 1 Wallace R., 25; 21 Ill., 457; 7 Ind., 369, 373; 10 ib., 93, 94; 6 ib., 318; 9 ib., 358, 359; 16 ib., 46; 11 ib., 399, 415; 30 Penn. R., 46.

In 22 Ohio cited, less than two thirds of the stockholders consented to the consolidation.

The acts of consolidation may be proved by parol; they need not be in writing. (In the case at bar the acts are alleged.)

The acts and consent of corporators may be proved by parol, though the charter directs them to be in writing, and the records of the corporation are silent. 12 Wheaton, 64, 72, 73, 74; 15 Ind. R., 55; Angell and Aimes on Cro., Sec. 284.

The law of presumptions and estoppel applies to corporations the same as to individuals. 12 Wheaton, 70; Angell and Aimes on Cor., Secs. 112, 283-4.

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

"Acts done by corporations, which pre-suppose the existence of other acts to make them legally operative, are presumptive proof of the latter, and slight acts are held sufficient for this purpose." 12 Wheaton, 70.

If the officers of a corporation openly exercise a power which pre-supposes a delegated authority for this purpose, and other corporate acts show that the corporators must have contemplated the legal existence of such authority, the acts of such officers will be deemed rightful, and the delegated authority will be presumed. Id., p. 70; Herman on Estoppels, Secs. 539, 540, 543.

Votes of corporators may be presumed from the existence of corporate power which pre-supposes their existence. 12 Wheaton, 71-2-3.

Corporations may surrender valuable rights without vote or deed. Id., 73; 1 Pick., 297.

According to the principle of these authorities, the acts of ownership exercised over the road east of Lake City by the Jacksonville, Pensacola and Mobile Company and its officers, deed of trust, &c., indeed full corporate powers and franchises will be deemed rightful, and the law presumes that such power and franchises were duly conferred without further evidence.

Section 14 of the Act of June 24, 1870, confers upon the railroad companies authority to consolidate " on such terms as may be agreed on, and such companies are authorized to settle the terms of consolidation by arbitration or otherwise."

It will be observed that the mode and manner of consolidation is left by the statute indefinite and to the discretion of the companies, only there must be a majority assent of the parties in interest. It has already been shown that the acts of consolidation in this case were assented to by nearly all of the stockholders of the Florida Central and of the Jacksonville, Pensocola and Mobile Company.

Where a corporation have power to do an act, they may be estopped from objecting that the form they adopted was

250 SUPREME COURT.

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

not the mode prescribed in the charter. 22 Com., 502 ; 52 Penn., 506 ; Hermon on Estoppels, Sec. 563.

"A corporation, by the acts of merging into another corporation, is estopped from claiming that it is a distinct and independent corporation." 5 Clarke, Iowa, 357 ; Hermon on Estoppels, Sec. 543 ; 1 Paige, 595 ; 8 Cowen, 387.

It is claimed that a single stockholder of a single share of stock may prevent consolidation, and that it cannot be done without his consent. It is also claimed that the fact that Mr. L'Engle brought a suit in May, 1872, shows that he did not consent ; but this was two years after the actual consolidation and merging of the two companies took place, and it has not been proven yet that Mr. L'Engle is a stockholder. If he was, he is estopped, for the "shortest acquiescence will estop a stockholder from objecting." 2 Vol. Redfield, 576 ; 23 How., 381.

In this case a stockholder was held estopped from setting up objections to the validity of bonds issued upon the authority of less than two thirds of the stock, after the lapse of six months. 7 Ohio, N. S., 327 ; 6 ib., 119.

The objecting stockholder must allege and prove that he expressly dissented, and the burden of proof is not on the other side to show his assent. 8 Fla. R., 371.

The amalgamation of the two companies was acquiesced in for over two years without objection, and even Mr. L'Engle did not object till after this suit was brought. No objection was made till it was found the road had slipped from the hands of irresponsible men, who preferred to pocket the income of the road instead of paying its just debts.

" The conduct of corporations and stockholders and their acquiescence is to be viewed by the court from an external position." 23 How., 400.

It is submitted that upon the allegations in the complaint upon which this Receiver was appointed, the roads were in fact and in point of equity consolidated, and the court below was justified in so considering them.

But if there was not a consolidation there is a good cause of action and ground for appointing a Receiver over the road east of Lake City, set forth in the amended bill, that is the arrears of interest on $1,000,000 of bonds.

If the Florida Central had a separate existence, and had so little regard for its credit and for its creditors as to allow the Jacksonville, Pensacola and Mobile to take possession of it and make a deed of trust of it, and failed to pay its interest, then, under the authorities cited above, a Receiver should be appointed. The court had jurisdiction to make the appointment; and as to the road west of Lake City, no one can raise the question of jurisdiction but the trustees in possession of the Jacksonville, Pensacola and Mobile Company. Holland cannot raise the question; he took nothing by his purchase but a bag of wind. A railroad or part of a railroad cannot be sold on execution at law.

A corporation may be sued in any county where it exercises corporate powers or franchises, and may be sued in any county where it has an office, though no part of its road is in such county. 15 Ill. R., 436; 5 Iowa R., 518, 520; 2 Richardson S. C. Law R., 512; 8 Iowa R., 260; 1 Strobbart's Law R., 70; Angell and Aimes on Cor., Sec. 107; 12 Wallace, 65.

Where a corporation has an office in more than one county, suit may be brought in either. Angell and Aimes on Cor., Sec. 107, notes 2, 3; 17 Me. R., 434; 12 Grattan, 655; 7 Ind., 25. Laws of State of Florida, (1868,) Chapter 1639, Sec. 24, as follows: "Suits against corporations shall be commenced only in the county where such corporation shall have or usually kept an office for the transaction of its customary business. * * * Summons shall be served on the President or other chief officer of the company." Id., Sec. 25.

Under the Code of procedure of Florida, defendant may be sued in any county. If the defendant objects to the trial of the case in the county where the suit is brought, he must

apply to the court for removal to what he claims is the proper county. Code of Procedure, Act of February 19, 1870, Secs. 74–5–6–7.

It is too clear for argument that the Jacksonville, Pensacola and Mobile Railroad Company, exercising its functions in Duval county, was, under the statutes of Florida, liable to be sued in that county, and that the Circuit Court of that county had jurisdiction of the person or corporate body and the trustees of that body.

A court of chancery, with jurisdiction of the defendant, can appoint a Receiver over property even beyond its jurisdiction. Edwards on Receivers, pages 6, 7 ; 2 Paige's Ch. R., 615.

This power will be exercised by the court if necessary by compelling the defendants to make such assignment of it as to vest the title and possession in the Receiver. 17 How., 322 ; 2 Paige's Ch. R., 615. In this case the question arose touching property beyond the State of New York.

In the case of Booth vs. Clark, 17 Howard, the doctrine is admitted that in such case the court may compel the defendant to execute a deed or assignment so as to vest the title and possession in the Receiver of property not within its jurisdiction.

"He (Receiver) is the representative of the court, and may, by its direction, take into possession every kind of property which may be taken in execution, and also that which is equitable, if of a nature to be reduced to possession. The appointment of a Receiver is an equitable execution." Edwards on Receivers, p. 6 ; 17 How., 331 ; Jer. Jur. Eq., 249.

Now any execution which the State court may issue in the case after final judgment will be of "full force and effect throughout the State."

Statutes of Florida upon this subject are as follows : "If any judgment at law or decree in chancery shall be rendered against any corporation, it shall be lawful for the

plaintiffs in the suit to sue out either a distrain or *fieri facias* or *elegit* as he may think proper, and said writs of *fieri facias* and *elegit* may be levied as well on the current money as on the goods and chattels of said corporation.'' Act of Nov. 23, 1828, Sec. 58, Thompson's Dig. of the Laws of Florida, 354 ; Bush's Digest, 324..

"All writs of execution shall bear date as of the day on which they shall be issued, and shall be directed to all and every the sheriffs of the State of Florida, and shall be of full force throughout the State." Thompson's Digest, 355 ; Bush's Digst, p. 324, Sec. 3, Acts of February 17, 1833, and of March 15, 1844.

"All writs of execution upon any judgment obtained for the use of the State in any of the courts of the State in any one county, may run and be executed in any other county of the same, but shall be issued from and made returnable to the court where the judgment was obtained, any law to the contrary notwithstanding." Act of February 10; 1832, Sec. 6 ; Thompson's Dig., 417.

"Execution may be issued at the same time to different counties. Real property adjudged to be sold must be sold in the county where it lies by the sheriff of the county or by a referee appointed by the court for that purpose, and thereupon the sheriff or referee must execute a conveyance to the purchaser, which conveyance shall be effectual to pass the rights and interests of the parties adjudged to be sold." Code of Procedure, Act February 19, 1870, Sec. 232.

These laws vest the Circuit Courts with power to reach, by a final execution or decree, any property of the defendant in any part of the State, and if such court has jurisdiction by final process over property in any part of the State, it would be a strange doctrine—indeed a judicial anomaly —to hold that such court has not jurisdiction by a proper interlocutory process over the same property before final judgment. Besides, there is a general grant of judicial

power in the Constitution so broad and comprehensive as to leave no room for doubt on this subject. It is in the following words: "The Circuit Courts and the judges thereof shall have power to issue writs of mandamus, injunction, *quo warranto, certiorari,* and all other writs proper and necessary to the complete exercise of their jurisdiction." * * * Const., Art. 6, Secs. 7, 8 ; Bush's Digest, 386.

Without power to take possession of property by intermediate remedial writs, the court would fail in the complete exercise of its jurisdiction by the removal or destruction of the property before final judgment.

*When jurisdiction of action acquired.*—"From the time of the service of the summons in a civil action or the allowance of a provisional remedy, the court is deemed to have acquired jurisdiction and to have control of all the subsequent proceedings." Code of Procedure, Sec. 90 ; Bush's Dig., 484.

Summons may be served anywhere within the State, and if defendant is not found within the State, service may be made by publication. Id., Secs. 85–6 ; Bush's Digest, 481.

The defendants err in supposing that the jurisdiction of the Circuit Courts is restricted to the counties within their respective circuits. Such courts are limited to suits brought within the circuit, but in a suit brought within the circuit such court has jurisdiction over the defendant or subject matter anywhere in the State.

If the appellants theory is right, then Judge Bryson could exercise jurisdiction only over that part of the road in his Circuit, and Judge White over that in his Circuit ; therefore the road could only be sold in separate parcels. Such argument proves too much.

*Supplemental Complaint.*—The supplemental complaint sets forth how the Florida Central was kept on foot, to wit: by the illegal voting of some 4,410 shares of stock in the hands of Houston, which belongs to Littlefield and which the latter had paid for. It was by the voting of this stock,

without Littlefield's consent, that the Florida Central was illegally kept up. The parties claiming to be stockholders and directors are made parties defendant so that they may be compelled to show their interests and restrained from using the name of the Florida Central until their right to do so shall be ascertained. They surrendered their franchise to the Jacksonville, Pensacola and Mobile, and cannot be permitted to attempt to exercise them again by fraud and chicanery.

Doing acts or suffering acts to be done that destroy the end and object for which a corporation was created, must be regarded as equivalent to a surrender of its rights. 2 Abbott's N. Y. Digest; 19 Johns., 456; Hopkins' R., 300; 6 Cowen, 217; 17 N. Y. R., 93, *et seq.*

"The election of trustees, made* apparently for no other purpose than to keep the company in existence, will not prevent a dissolution." 8 Cowen, 387.

WESTCOTT, J., delivered the opinion of the court.

Appeals are prosecuted in this case by the Florida Central Railroad Company, Daniel P. Holland, Edwin M. L'Engle, Francis F. L'Engle, F. B. Papy, George R. Foster and Theodore Hartridge.

The first question which arises under the errors assigned is, was the Judge of the Fourth Circuit qualified to hear this case?

It is insisted by defendant, Daniel P. Holland, that the Judge of the Fourth Circuit has been of counsel in this cause.

It appears from the record that Judge Archibald, before his appointment as Judge, represented the receiver in an application by the Atlantic and Gulf Railroad Company for an order for the payment of moneys due it by the receiver. This company owned a line of railway connecting with the road in the possession of the receiver, and it was claimed that he had moneys due it for through tickets and freights. This was a matter independent of the main suit, in the

256          SUPREME COURT.

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

consideration of which it was not necessary that the attorney should have formed any opinion, or to have investigated the equities of this case, or the propriety of the appointment of the receiver, or any question between the parties to this controversy, which he afterward decided as Judge.

We think there is nothing in the objection, and the challenge must fail.

We first consider the case of the Florida Central Railroad Company.

This company takes an appeal, claiming to be a party to the suit, with the right to appeal and to be heard. On the other hand, the respondents insist that it is no party, that its position is that of a person claiming title paramount, that it was not in possession when the receiver was appointed, and that it should intervene by petition to be examined *pro interessee suo*. To the original complaint the Florida Central Railroad Company was no party. This complaint alleged that the possession of the line of road from Lake City to Jacksonville was then in Chase and Flagg, trustees, who held such possession under a deed of the Jacksonville, Pensacola and Mobile Railroad Company, in which it claimed ownership of the entire line. This deed purported to convey to these parties the entire line of road for a term of two years.

If this suit had proceeded under this original complaint, it may be true, that, according to the rules of equity practice prevailing before the code, the Florida Central Railroad Company, if it claimed title paramount to the Jacksonville, Pensacola and Mobile Railroad Company, the lessor in the deed mentioned, as well as against the lessees in possession, should have intervened by petition.

But however this may have been under the original complaint we need not determine, as the same case is not presented by the amended and supplemental complaint, and the subsequent proceedings in the case. That complaint sets up, by way of supplement, that E. M. L'Engle, claiming to be a

stockholder in the Jacksonville, Pensacola and Mobile Company, and in the Florida Central Company, *as two distinct corporations*, has filed a bill against the Jacksonville, Pensacola and Mobile Company and others, claiming rights to the exclusion of the plaintiffs in this cause, and that the receiver heretofore appointed in the case has been, on the application of the said L'Engle, and by order of this court, displaced as receiver of that part of the Jacksonville, Pensacola and Mobile Railroad, lying between Lake City, Florida, and Jacksonville, Florida, described in his bill as the Florida Central Railroad, and another receiver appointed in his place. From the report of receiver Greeley, filed on the 7th of June, it appears that at the time the order of June 22d was made, the possession of what it claimed to be the Florida Central Railroad was with the agents and employees of that company under receiver Baker, he being one of the three receivers of the "earnings" of the entire line of road. This supplemental complaint also sets up that Houston and others, assuming to be the owners of stock, have held meetings of the stockholders of the said Florida Central Railroad Company, claiming that it was no part of the said Jacksonville, Pensacola and Mobile Railroad Company, and has voted said stock, although said stock did not belong to said Houston, but was the property of M. S. Littlefield.

It alleged, also, that the State of Florida, in exchanging securities, required that one million of the bonds should be executed in the name and under the seal of the Florida Central Railroad Company, and that all the necessary steps to constitute a *pro forma* consolidation between the Jacksonville, Pensacola and Mobile Company and the said Florida Central Company, as described by its original charter and enabling act, had not been taken.

One of the prayers of the amended complaint was, " that for the purpose of the decree hereinafter prayed, the said the Florida Central Railroad Company be made a party defendant hereto." We thus see that the plaintiffs in this action

made the Florida Central Railroad Company a party to the amended complaint; that they set up the fact that such a body claimed to be in existence as a separate corporation; that persons claiming to be stockholders in such corporation were asserting that they were the holders of a subsisting stock interest; that these stockholders had, in this court, caused the original receiver appointed in this case to be displaced and a new one appointed in the stockholders' suit. On the 14th day of August, A. D. 1872, the Florida Central Railroad Company, upon petition and after notice, was made a party defendant to the suit, the order being as follows: " On reading and filing the petition of the Florida Central Railroad Company, a corporation in this State, under and by virtue of the laws thereof, and proof of due service of the notice of this motion; now, on motion of Peeler and Raney, attorneys for said Florida Central Railroad Company, Charles P. Cooper, acting attorney-general, appearing for the plaintiffs, it is ordered that the said Florida Central Railroad Company be made a party defendant herein, and the summons and complaint be amended accordingly, and that the cause proceed in like manner as if the said Florida Central Railroad Company had originally been made a party defendant herein." On the 3d of September, A. D. 1872, this defendant filed its answer to the amended complaint. In the final decree from which this appeal is prosecuted it is considered by the court, and is thereby adjudged, that the Florida Central Railroad Company shall be held and deemed to be consolidated with the Jacksonville, Pensacola and Mobile Railroad Company, thereby determining the principal issue raised by the pleadings of this defendant, and which, according to the pleadings, was a very important question in the case. Under the provisions of the code, an amended pleading takes the place of and supersedes the original, (4 Howard, 174; 12 How., 521; 5 Duer, 656,) and the amendment of the complaint relates back to the commencement of the action. This is true of the amended complaint, except

so far as it alleges supplemental matter, and that of course cannot be a substitute for the original. Under the provisions of the code, "any person may be made defendant who has or claims an interest in the controversy adverse to the plaintiff, or who is a necessary party to a complete determination or settlement of the questions involved therein." In this cause, the Trustees of the Internal Improvement Fund seek to subject the line of railway extending from Lake City to Jacksonville to its claims against the Jacksonville, Pensacola and Mobile Railroad Company, one of the grounds being that such line of railway is the property of said company, while in their complaint they set up that there are persons claiming to be owners of such road other than their debtor, and that there is a corporation alleged to be in existence as the owner of said line of railway other than the Jacksonville, Pensacola and Mobile Railroad Company. It appears from the complaint, that consolidation was questioned by persons claiming to be stockholders and a body claiming to be a corporation. They also claim as against this alleged pretended organization, that its incorporators have failed to comply with the conditions of sale attending their purchase of said line of railway. For the purpose of contesting these and the other questions involved in this controversy, the plaintiff named the Florida Central Railroad Company a party, and, by a subsequent order of the court, it was made a party upon its petition after notice. It subsequently filed its answer, and it is as much bound by the final judgment in this case as any party can be. It is therefore in a condition to appeal from the orders and judgment in this case, and to raise any question which any party appellant can raise under the rules controlling the subject.

As to the appellant, Daniel P. Holland, it is only necessary to say that he is expressly named a party defendant in the supplemental complaint of plaintiffs, filed March 25th, 1874 ; that he was then in possession of the line of railway extending from Lake City to Quincy, claiming to hold it by

a title superior to that of each of the plaintiffs in this suit; that this property, thus in his possession, was the subject matter of this litigation, and that upon the day of filing the supplemental complaint, the plaintiff, the Trustees of the Internal Improvement Fund, applied for and obtained an injunction against him as defendant, Daniel P. Holland. The other appellants are likewise parties to the supplemental bill. Some of these parties had not been served with process before entering their appeal. This, however, makes no difference, as they can appear voluntarily, and take such action as a party served with process can take. (Danl. Chy. Prac., 560–561; 8 Paige, 45; 1 Smith Chy. Prac. 158; 2 Mad. Chy., 206.) These parties are before this court, therefore, as appellants, entitled to be heard in respect to every question which they can properly raise upon such an appeal as they have taken.

The appeal in this case is taken from a final decree, and the rule announced by this court repeatedly is that such an appeal brings up the whole merits of the cause, and the previous proceedings generally. (2 Fla., 301–2; 4 Fla., 363–4; 9 Fla., 50; 10 Ohio, (State,) 511; 9 Wis., 495; 17 Mrld., 231; 17 John., 559; 1 John Cas., 498.) Such, too, is likewise the rule of the code.

We come now to the consideration of the case of the Trustees of the Internal Improvement Fund and the Florida Central Railroad Company.

Under the provisions of the act of January 6, 1855, entitled "An act to provide for and encourage a liberal system of internal improvements in this State," a line of railway from Jacksonville to the waters of the Pensacola Bay, with an extension to St. Marks, was designated as a proper improvement to be aided from the Internal Improvement Fund, in the manner provided in said act. Two companies controlling a part each of that line, the Pensacola and Georgia Railroad Company and the Florida, Atlantic and Gulf Central Railroad Company, having accepted the provisions

of that act, issued bonds under the third section thereof. This section provided that " all bonds issued under the provisions of this act shall be a first lien or mortgage on the road-bed, iron, equipments, work-shops, depots and franchise; and upon the failure upon the part of any railroad company accepting the provisions of this act to provide the interest, as herein provided, on the bonds issued by said company, and the sum of one per cent. per annum as a sinking fund, it shall be the duty of the trustees, after the expiration of thirty days from said default or refusal, to take possession of said railroad and all its property of every kind, and advertise the same for sale at public auction to the highest bidder, either for cash or additional approved security, as they may think most advantageous for the interest of the Internal Improvement Fund and the bondholders. The proceeds arising from such sale shall be applied by said trustees to the purchase and cancelling of the outstanding bonds issued by said defaulting company, or incorporated with the sinking fund; Provided that, in making such sale, it shall be conditioned that the purchasers shall be bound to continue the payment of one-half of one per cent semi-annually to the sinking fund, until all the outstanding bonds are discharged, under the penalty of an annulment of the contract of purchase and the forfeiture of the purchase money paid in."

The Florida, Atlantic and Gulf Central Railroad Company, owning the line of road from Lake City to Jacksonville, having failed to comply with the requirements of the act as to the interest and sinking fund upon its bonds, was sold by the trustees on the fourth of March, A. D. 1868, William E. Jackson and his associates becoming the purchasers. The complaint alleges that there were outstanding bonds, and that such purchasers have failed to continue the payment of the sinking fund, as required by law. William E. Jackson and his associates, after their purchase, were made a body politic and corporate, to operate said line of road, under the name of the Florida Central Railroad Com-

pany. This company, as to this allegation of the complaint, answers that the road was purchased by William E. Jackson and his associates for the sum of one hundred and eleven thousand dollars; that this amount was paid; that nearly all of the bonds of the Florida, Atlantic and Gulf Central Railroad Company were paid in to the trustees by the purchasers (being rated at about twenty cents on the one hundred) and cancelled, leaving outstanding, upon which they were required to pay a sinking fund, only about one hundred and twenty thousand dollars of bonds.

That Edward Houston was appointed the agent of the trustees to take up the outstanding bonds, and that said agent has, from time to time, as fast as he could obtain information of their whereabouts, taken up said bonds, and that there is now outstanding only about twenty thousand dollars of these bonds. That the sinking fund due by this defendant was paid up to the fourth of March, A. D. 1870, and that said Houston, the said agent of the trustees, had in his hands, on the 16th of May, A. D. 1872, to the credit of this defendant, on account of said sinking fund, six hundred and thirty dollars, and that there was nothing due by this defendant, on account of said sinking fund, at the time of filing said complaint. So far, therefore, as the matter of the non-payment of this sinking fund is concerned, the record before the court below presented an issue of fact, and such was the state of the *record at the time of the final decree, as no testimony was ever taken.*

The trustees, in addition to this, set up another claim in their complaints, amended and supplemental against this line of road, upon the basis of the consolidation and amalgamation of the Florida Central Railroad Company with the Jacksonville, Pensacola and Mobile Railroad Company. The trustees allege that the Tallahassee Railroad Company and the Jacksonville, Pensacola and Mobile Railroad Company were indebted to them for a balance of unpaid purchase money, due on account of the sale of the line of road

extending from Tallahassee to St. Marks, and from Lake City to Quincy; that the line of road from Quincy to Lake City had been constructed and owned by the Pensacola and Georgia Railroad Company, and the road from Tallahassee to St. Marks had been constructed by the Tallahassee Railroad Company.

That the two last named companies had accepted the provisions of the Internal Improvement Act, and had issued first mortgage bonds on their respective lines of road. That, failing to pay the interest and sinking fund, as required by law, the roads were seized and sold. That there is a large balance of the purchase money for these roads due and unpaid by the purchasers thereof, and that there have been no payments made by them on account of the sinking fund. That, subsequent to this sale, the Jacksonville, Pensacola and Mobile Railroad Company was incorporated, with power to complete, equip and maintain a connection by railway between Jacksonville and Pensacola; and that, under said act, the several corporations owning any part of this line might be consolidated by a majority vote of the stock; and that the companies owning the lines of railway from Quincy to Lake City, and from Tallahassee to St. Marks, and from Lake City to Jacksonville, have been consolidated and amalgamated with the Jacksonville, Pensacola and Mobile Railroad Company, whose owners and incorporators, together with the said line of railway, are liable for the balance of the unpaid purchase money due the trustees, and the sinking fund due on the outstanding bonds. The last supplemental complaint, filed after the answer of the Florida Central Railroad Company, sets up other and additional facts as to the matter of consolidation, but its effect cannot be more than to make an issue of fact.

The claims of the trustees arising out of the balance due on the purchase of the roads from Quincy to Lake City and from Tallahassee to St. Marks, can exist against the road from Lake City to Jacksonville only upon the hypothesis

that it is the property of their debtor, the Jacksonville, Pensacola and Mobile Railroad Company, or through some relation of the Jacksonville, Pensacola and Mobile Railroad Company to said property, and not from anything arising from the bonds issued under the act of January 6, 1855, *by other companies.*

It is too plain for argument that bonds issued by the Pensacola and Georgia Railroad Company, and the Tallahassee Railroad Company, are not in any way a lien on the road from Lake City to Jacksonville. This claim of the trustees, it is thus seen, is based upon the alleged amalgamation of the Florida Central Company with the Jacksonville, Pensacola and Mobile Railroad Company. Without narrating at length the facts stated in the answer of the Florida Central Railroad Company, it is enough to say that its effect is to put in issue this fact of consolidation, which is the whole foundation of the claim of the trustees to subject it to sale, to pay the balance of the purchase money due on the sale of the other lines of road. So far as the trustees are concerned in their relations to the alleged Florida Central Railroad Company, it is thus apparent that at the time the final decree or judgment was rendered in this case, all the facts which constituted the basis of their claim against that alleged company, its incorporators, or the line of road which it claimed to own, were at issue under the pleadings in the case.

With the pleadings in this condition, and without notice or opportunity for hearing, the final decree against the Florida Central Railroad Company was entered, and for these reasons it must be reversed as to the trustees.

In behalf of the State nothing is decreed, except that the Florida Central Railroad Company is consolidated with the Jacksonville, Pensacola and Mobile Railroad Company, and as that fact was in issue between the State and this alleged company under the pleadings, and the judgment was rendered without notice, evidence, or an opportunity for hearing, and without default, in the same manner as the judg-

ment was rendered in behalf of the trustees, it must likewise be reversed as to that alleged company. It was entirely inconsistent with and in violation of the simplest principles prevailing in courts accustomed to the due and orderly administration of justice for the Circuit Court of Duval county, thus, in the face of these issues, without testimony, and without notice and without default in pleading, to pass a final judgment affecting the rights of a party which was, by its own order and after due notice, brought into the case. These facts are embraced in the issue made by the pleadings. We must, as the court below should have done, leave them to be determined in the usual method, and recognize the impropriety of any attempt on our part to determine them as the case is now presented here.

The next case we consider is that of defendant Daniel P. Holland and the trustees.

On the 24th of March, A. D. 1874, the plaintiffs filed a supplemental complaint, in which Daniel P. Holland was named a party defendant, reciting that since the filing of the amended complaint, and about the 2d day of December, A. D. 1872, the said Holland recovered a judgment against the Jacksonville, Pensacola and Mobile Railroad Company, in the Circuit Court of the United States for the Northern District of Florida, for the sum of about sixty thousand dollars, caused execution to be issued thereon, and levied the same upon the equity of redemption of the railroad and appurtenances and property of the Jacksonville, Pensacola and Mobile Railroad Company west of Lake City, and that this property was sold on the first Monday of May, A. D. 1873, the said Holland becoming the purchaser, crediting the amount of the bid on the execution. That soon thereafter he acquired the possession of the railroad of the Jacksonville, Pensacola and Mobile Railroad Company, and has ever since retained possession thereof, receiving the rents and tolls therefrom; that such line of roads and property had been taken possession of by J. C. Greeley, the receiver

heretofore appointed in this cause ; that ·said Greeley had never been discharged, and that such act of the said Holland was in contempt of this court and its orders.

That about the last of May, 1872, Francis B. Papy, an employee of said Receiver, accepted the appointment of Receiver by the Judge of the Second Judicial Circuit of Florida, made in a suit instituted by holders of first mortgage bonds of the Pensacola and Georgia Railroad Company against the Jacksonville, Pensacola and Mobile Railroad Company and the Trustees of the Internal Improvement Fund.

That in July, 1872, other first mortgage bondholders brought a suit in said United States Court against the Jacksonville, Pensacola and Mobile Railroad Company and the said trustees, and on the 19th of December the said Jacksonville, Pensacola and Mobile Railroad Company withdrawing its answer, and the suit being dismissed as to the trustees, who plead to the jurisdiction, a decree *pro confesso* was taken against the Jacksonville, Pensacola and Mobile Railroad Company ; that these proceedings in said United States Court are more fully set forth in a bill in equity, brought by the State of Florida against said first mortgage bondholders, Daniel P. Holland and others, in the Supreme Court of the United States, and therein now pending, a true copy whereof, and of the writ of injunction therein granted, is hereto attached, and prayed to be taken as a part of this supplemental complaint, as fully as if specially set forth herein. That the complainants, who had so obtained the decree *pro confesso* against the said company, entered into an agreement with said company, whereby complainants in said decree and in said suit, wherein Papy was appointed Receiver, agreed to dismiss the last mentioned suit, to discharge said Papy, and allow said company time to pay the amount of said decree ; that afterward, by concert of action between the complainants in the two suits with the marshal of said district, said Papy was discharged as Receiver, and

The State of Florida et al. v. The J. P. & M. R. R. Co. et al.

the suit wherein he was appointed, dismissed, and said marshal, contemporaneously with said Papy's discharge, levied the said decree of the 19th of December on said property west of Lake City, and advertised the same for sale on the 7th day of July, A. D. 1873, which sale was postponed to January 1st, 1874, under an agreement with said Holland. That before the levy of said decree by said Conant, he was given written notice of the appointment of Receiver Greeley, and of his right to actual possession, and that after levy of said decree the said Greeley was kept out of possession.

That after said sale to Holland and the postponement of the sale under the decree, said Holland employed said Conant ostensibly as manager, and the said Conant, as such pretended manager, still claims to be in possession of said property with said Holland. That said Conant has been enjoined as marshal, and the said bondholders as plaintiffs, from any further proceedings under said decree, and that said Conant is not authorized by the decree under which he claims to have made said levy, to receive the tolls of said railroad, nor to interfere with its management. That said Holland has filed his answer in said suit in the Supreme Court of the United States, a copy of which is herewith filed, wherein he questions the jurisdiction of this Court as to that part of the road lying west of Lake City, although such jurisdiction has never been questioned by the Jacksonville, Pensacola and Mobile Railroad Company. That all of these proceedings of the said Holland are in contempt of the orders of this court, and that the said Holland, as the attorney of the Jacksonville, Pensacola and Mobile Railroad Company, had full notice of the orders of this court in this behalf; and that said Holland is insolvent and without property in this State or elsewhere, subject to judicial sale.

From the answer of defendant Holland to the bill in equity of the State of Florida in the Supreme Court of the United States, which is made an exhibit to this supplemental complaint, it appears that Holland, in that court, questions

the validity and legality of the State bonds as well as the alleged lien of the trustees.

It also appears that, upon the filing of the bill in the Supreme Court of the United States, the plaintiff (the State of Florida, in her own right as well as in right of the trustees,) entered a motion for a preliminary injunction and the appointment of a Receiver, as prayed for in its said bill.   The special writ of injunction prayed for was to command said Holland to vacate the possession of the Jacksonville, Pensacola and Mobile Railroad, and to desist from further intermeddling with any of the property of the Jacksonville, Pensacola and Mobile Railroad Company, and to deliver the same to said Jonathan C. Greeley, the Receiver of said property, or in lieu thereof, that the court appoint a Receiver of all of the property of the Jacksonville, Pensacola and Mobile Railroad Company situated west of Lake City. The court upon this motion failed to appoint a Receiver, and ordered defendant Holland to account for all the sums received by him from the earnings of said road, and to make monthly statements of such sums as he would receive in future.   At the time of filing this supplemental complaint against defendant Holland, it thus appears that he was in possession of the road west of Lake City, and had been, upon the motion of one of the plaintiffs in this cause, ordered to render an account of his past and future receipts from the road, the court having denied a motion for the appointment of a Receiver, and having refused to order defendant Holland to deliver possession to Receiver Greeley.

This supplemental complaint was filed on the 24th of March, A. D. 1874.   With it was filed an *ex parte* affidavit of M. S. Littlefield, giving a detailed statement of facts in reference to the matter of consolidation, the exchange of securities between the State and the companies, as well as a history of the judicial proceedings in reference to the line of railway involved in this suit.   With it was also filed an affidavit of H. Bisbee, stating the insolvency of the parties in

possession of the property, and giving the amount of interest due on the bonds of the companies held by the State. Upon the same day, and upon the application of the Trustees of the Internal Improvement Fund, and without notice to defendant Holland, the court passed an order and decree commanding him, his agents and employees to desist from any further intermeddling with the possession of the line of road from Lake City, Florida, to the Apalachicola river, and from exercising any control over any of the engines, cars, etc., appertaining to the said road, as well as from removing any of said property out of the State. The court also decreed "that you, the said Holland, do desist from, and you are hereby enjoined and restrained from instituting any suits at law or in equity in any court or place for the purpose of asserting or claiming any right, title, or interest in, to, or of any part of said railroad, rolling stock and appurtenances, until the further order of this court." This order is served upon Sherman Conant, manager of said Jacksonville, Pensacola and Mobile Railroad, upon the various officers upon the line of road, and upon defendant Holland, on April 1, A. D. 1874.

Upon the application of the trustees, and without notice, the court upon the same day then ordered defendant Holland to deliver possession. This order is served and returned. The Receiver, Greeley, then reports to the court that he had passed over the line of the road on the 25th of March, taking possession of the line of road to Tallahassee, at which place the superintendent of the road failed to yield possession, and telegraphed the agents along the line of road not to obey the Receiver's orders.

On the 28th of March, A. D. 1874, the court entered an order directed to all and singular the sheriffs of the State, commanding them to put the Receiver in possession of the road lying west of Lake City. Then follows a rule to show cause (directed to defendant Holland) why he should not be attached for a contempt in violating the order of the court

of March 20th, A. D. 1872, appointing J. C. Greeley Receiver, in interfering with his possession and enjoining him from intermeddling with the possession of said Receiver. No final action appears to have been taken in this proceeding.

On the 2d April, A. D. 1874, on the motion of plaintiff, and after notice duly served upon the Jacksonville, Pensacola and Mobile Railroad Company, the answer of that company was adjudged frivolous, as an answer to the claim and demand of the Trustees of the Internal Improvement Fund, and an order made declaring said trustees entitled to a judgment and decree against said company, for the amount due on the balance of the purchase money due on the sale of the Pensacola and Georgia and the Tallahassee Railroads. On the same day the final judgment was entered.

This judgment is entered on the motion of the Trustees of the Internal Improvement Fund. The first portion of it decrees that the trustees do have and recover of the Jacksonville, Pensacola and Mobile Railroad Company the sum of six hundred and sixty-one thousand eight hundred and forty-five dollars and fifty-five cents, together with costs.

The court then decrees that this sum shall be held and deemed to be against the said company, and all persons claiming through or under it, a lien upon all the property owned by or belonging to said company at the date of the commencement of this action; that the Receiver, J. C. Greeley, heretofore appointed in this cause, be continued; that all the net income derived from said line of road be paid over by him to the treasurer of the trustees; that the Receiver continue to discharge his duties as Receiver of the line of road until the further order of the court; and that the clerk of every county in which this decree may be recorded do issue, in behalf of the plaintiffs, the trustees, against the goods and chattels, lands and tenements of the Jacksonville, Pensacola and Mobile Railroad Company, the writ of *elegit* or the writ of *fieri facias* for the aforesaid

sum of six hundred and sixty-one thousand eight hundred and forty-five dollars, upon the præcipe of the attorney in this cause.

It is thus seen that the court, without service of process or notice, or opportunity to answer the supplemental complaint on the part of the defendant Holland, entered an interlocutory order decreeing against his right to possession; and afterward without notice, and before the time for answering the complaint expired, and in ten days after filing the supplemental pleading which made him a party, entered a final judgment and decree, determining against his rights to the property.

That plaintiffs think his claim is nothing makes no difference. The court must hear him before it proceeds thus finally to dispose of his rights. These orders determining the right to possession, and the final decree adjudging the right, must be reversed, in so far as they affect defendant Holland as having been made without notice or opportunity for hearing.

We next come to the consideration of the appeal and case of defendant E. M. L'Engle. He assigns for error the order of June 24th, A. D. 1872, the order of March 25th, 1874, the final judgment rendered herein on the 2d of April, A. D. 1874, and the order of April 13th, 1874.

The order of June 24th followed the filing of the amended complaint of June 22, 1872, and directs this defendant "to consolidate his suit herewith, or come in as a party defendant hereto."

In the second amended and supplemental complaint, L'Engle is named a party defendant. On the 14th day of April, several days after the entry of the final judgment, and all the orders from which he appeals, he is served with a summons. He has, as such party, taken this his appeal, and has thus, under the supplemental complaint, come in as a party defendant.

This is a compliance with the order of June 24th, which

is in the alternative, and we can see no ground for a reversal of this order in this respect. As a party, he can interpose such defense as he thinks his case, whatever it may be, justified. What his case is, the record now before this court does not disclose beyond the fact that plaintiffs allege that he is a stockholder in and officer of the Florida Central Railroad Company, as well as a stockholder in the Jacksonville, Pensacola and Mobile Railroad Company, claiming rights adverse to the plaintiffs in this suit.

The order of March 25, 1874, was in part based upon the view that the order displacing Greeley and appointing Baker was void; that the original order appointing Greeley was a subsisting order, and that Greeley had the right to the possession. We need not repeat here what we subsequently say as to the matter of the receivership. For the reasons there given, we have determined that this order was not void, and its effect was to remove Greeley. Greeley's power as Receiver, under the order of June 22, 1872, being suspended and superseded by the appeal, it was error in the court to direct the parties in possession, who assumed to be officers and agents of the Florida Central Railroad Company, to deliver possession to him. So far as it purports to make an original appointment of a Receiver upon the supplemental pleadings, we cannot see that the case by them is any stronger than that made by the complaint. In fact, so far as this road was concerned, nearly every material allegation made by the trustees in the complaint was put in issue by its answer. The matter of consolidation was denied, as also was the allegation that there was something due the sinking fund by the purchasers of this road. In addition to this, the supplemental complaint is not sworn to, and the appointment, if considered an original appointment, was made without notice. We deem it unnecessary to repeat here the views expressed upon this subject; and refer to the subsequent portion of this opinion upon the subject of the appointment of a Receiver.

As to the final judgment herein rendered, it must be reversed in so far as it affects this defendant, because it is rendered without hearing or opportunity for the same before service of summons even, and without opportunity to answer the supplemental complaint, in which he was named a party, and thereby brought into the suit. The order of April 13, A. D. 1874, is an injunction directing this defendant to cease intermeddling with the line of road between Lake City and Jacksonville, from bringing any suit at law or equity for the purpose of asserting any right to said property, either as stockholder or otherwise, from using the name of the Florida Central Railroad Company, from in any manner appearing in, pleading in, or defending this action, and from appealing from any order in this cause, or from this order or any that may hereafter be made in the name of the Florida Central Railroad Company, from voting, using, or parting with the possession of any stock of the corporation formerly known as the Florida Central Railroad Company. So far as this order is based upon and is supplementary to the final judgment herein rendered, it must be reversed, for the reason that this judgment upon which it is founded must be reversed. The other assumption upon which this order was made was that the officers of the Florida Central Railroad Company were wrongfully in possession, and that the original order appointing Greeley was in force. This assumption, as we subsequently show, is wrong, and he could not have been entitled to possession under the order of June 22, A. D. 1872, as that had been suspended. So far as this order is based upon the assumption of consolidation, it must be reversed, because that question was in issue under the pleadings. Nor can we see any ground for such action at the suit of the trustees, as the bonds of the Pensacola and Georgia Railroad Company and of the Tallahassee Railroad Company were no lien upon the road from Jacksonville to Lake City. That portion of the order which enjoins this

defendant from taking an appeal in this suit is certainly very extraordinary in its character.

As to the defendants, F. B. Papy and George R. Foster, the record discloses that they were simply employees of the Florida Central Railroad Company, claiming no property in the subject matter of this suit, mere agents discharging duties directed by their principal, and therefore no necessary parties to the suit. All the proceedings against them, so far as they are the subject of appeal, are based upon the view that the original order appointing Greeley was still in force. This we have already remarked was erroneous. These orders being reversed at the suit of the Florida Central Railroad Company, they necessarily fail as to its officers, for it is through them that it is operated and managed.

As to the defendants Hartridge and Francis F. L'Engle, we cannot see that they are mentioned in the record otherwise than as parties claiming to be directors in the Florida Central Railroad Company. The judgment and all of these orders being reversed as to it, it follows necessarily that they fail as to its assumed directory. So far as they are stockholders, the court should not have made a decree affecting their rights without a hearing. There is no just foundation in law for these extraordinary proceedings. This suit must be dealt with as any other ordinary action. Under the pleadings in this case, the several matters of fact stated are in controversy. These questions must be tried, not assumed.

We now reach the last question in this controversy, upon which, in these appeals, it is necessary for us to express an opinion. This is the matter of the appointment of the Receiver. This appointment is resisted upon different grounds by the two appellants, the Florida Central Railroad Company and Holland, each of these parties claiming to own different parts of this line of railway. We first examine the question as to the Florida Central Railroad Company. That company was a party to the amended complaint, and the first question in reference to this matter which arises upon the

amended complaint is in whose possession was the line of road which it claims to own? J. C. Greeley had been appointed Receiver in this suit on the 20th of March, A. D. 1872. Subsequently a suit was brought in this court, (the Circuit Court of Duval county,) by E. M. L'Engle against the Jacksonville, Pensacola and Mobile Railroad Company and Florida Central Railroad Company and others. In this suit he claimed to be a stockholder in the two companies as two distinct corporations, alleging fraud and extravagant waste on the part of said corporation in the management of its affairs, charging fraud upon the State officers, and claiming rights and interests to the exclusion of the plaintiffs in this suit. On the application of L'Engle in his suit, Greeley, who had been appointed in this suit, was, by order of the Circuit Court of Duval county "displaced as Receiver of that part of the Jacksonville, Pensacola and Mobile Railroad lying between Lake City, Florida, and Jacksonville, Florida, described in his bill as the Florida Central Railroad, and another Receiver appointed in his place." The complaint then recites the appointment of another Receiver of the line of road west of Lake City by the Circuit Court of the Second Judicial Circuit of Florida, and alleges that there were then three Receivers of the "earnings" of the Jacksonville, Pensacola and Mobile Railroad Company. These are the allegations of plaintiffs in their amended complaint. It appears then that this court had in another case appointed another Receiver, instead of the Receiver originally appointed in this case, who had been displaced by this order made in the suit of L'Engle, and that this (his suit) was against these corporations and the officers of the State and others. A Receiver does not represent the plaintiffs in a suit, and the court should not in a subsequent suit displace a Receiver appointed in a prior suit, affecting the same subject matter. This we state as a general rule of convenience, and do not mean to say that under some circumstances it might not be proper. The proper course, as a

general rule of practice, is to extend the receivership in the first suit over the second, subject to the legal and equitable claims of all parties, and the rights of the parties in each suit are substantially the same as if different persons had been appointed at the several times when such receivership was granted. If, however, a different Receiver is appointed in the second suit, then the plaintiffs may claim that the Receiver in the former shall deliver to the Receiver appointed in his suit. (10 Paige, 47-8; 1 Barb. Ch. Rep., 268; 1 Hogan, 199, 258; 2 Paige, 342.)

The order appointing Baker Receiver, made in the suit of L'Engle, may have been erroneous and irregular, but no appeal is taken in that case, and in the absence of such appeal, it cannot be reversed or affirmed here. In the absence of the record in that case, neither this court nor the Duval Circuit Court can determine whether the case made by the bill justified this action. The proposition that the order displacing Greeley and appointing Baker Receiver is void, because not made in the same suit in which Greeley was appointed, cannot be sustained. If the court had jurisdiction of each of the cases and of both of the Receivers, then the removal of the one and the appointment of the other in either case cannot be void, for the reason that it is not made in either particular case. If the court had jurisdiction to appoint one, it had jurisdiction to remove him and appoint the other, and the order appointing Baker is not here for review. The cases cited by the respondents are cases in different courts, and the basis of the decisions is the well recognized principle that between courts of concurrent jurisdiction, the court that first obtained possession of the controversy, or of the property in dispute, must be allowed to dispose of it finally without interruption from the co-ordinate court. (20 How., 595-6.)

The authority cited in reference to the possession of a Receiver (14 How., 65) is to the effect that any attempt to disturb such possession, *without leave of the court* first obtained,

will be a contempt, and that when property is in the cus-
tody of a court of chancery, a sale under an execution issu-
ing from another court is void. Here, however, the Receiver
was displaced by the same court that appointed him. The
action was not without leave of the court, but was by order
of the same court that placed him in possession. The re-
spondents here affirm that the order of June 22d, 1872, does
not purport to appoint Greeley Receiver, but simply vacates
the appointment of Baker, and directs that Greeley be held
and regarded as such Receiver of the whole line of road, and
that he is still Receiver under the original order, and that no
appointment of a Receiver, under the order of the 22d of June,
is here for review, as none was made. As much importance
is given to this position, we will examine it at some length,
although we think it a very simple matter. In addition to
the allegations of the complaint, stating that a Receiver had
been appointed by this court in the case of L'Engle, and the
former Receiver displaced, we find a report of the Receiver
Greeley, filed on the 7th of June, A. D. 1872, in which he
states "that the Florida Central Railroad, in the hands of
Receiver J. M. Baker, collects a portion of the freight and
passage due to and belonging to the Jacksonville, Pensacola
and Mobile Railroad Company ; that the business on the line
of road is such that the agents of such road receive the whole
amounts of the entire distance traveled ; that this Receiver
cannot obey the orders of this court unless all the moneys
belonging to the Jacksonville, Pensacola and Mobile Rail-
road Company are paid over to him when collected by any
officer or agent of the Florida Central Railroad Company,
under said Receiver James M. Baker." He then prayed an
order directing Receiver Baker to pay to Receiver Greeley
all moneys arising from freights or passengers carried over
any part of the line of road from Lake City to the Apalach-
icola river. The court thereupon ordered James M. Baker,
the Receiver of the Florida Central Railroad, to require all
agents and employees of the Florida Central Railroad Com-

pany to pay all such moneys to the Receiver James M. Baker, and directed him to pay such moneys to Receiver Greeley. It is thus seen, from the record in this case, that, as a matter of fact, the Receiver, Greeley, was not in possession; that he had been displaced, and an order made appointing another person Receiver of the earnings of this road, and that the road was in possession of the "agents and employees of the Florida Central Railroad Company." It is clear that the order in the L'Engle suit was not void, and the necessary result is, that if Greeley was not appointed under the order of June 22d, A. D. 1872, Receiver of this road, he was no Receiver at all, for he certainly had been displaced according to the allegations of the complaint and the order of the court of the 7th of June, made in this case. The order of the 22d of June directs that the order appointing James M. Baker Receiver of so much of said railroad as was east of Lake City be vacated, as prayed for, and Jonathan C. Greeley be held and regarded as such Receiver of the whole line of road. Its legal effect is "an order reappointing Greeley" Receiver of the road from Jacksonville to Lake City, and vacating the previous order appointing Baker such Receiver. All presumptions are in favor of the propriety of the action of the court, in the absence of the record in the suit of L'Engle. We cannot, collaterally, in this suit, determine otherwise. If the matter was within the jurisdiction of the court, and no question of jurisdiction is raised by appellant, "it is a doctrine of law too long established to require a citation of authorities, that, where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decisions be correct or otherwise, its judgment, until reversed, is regarded as binding on every other court." From the nature of the case of L'Engle, as stated in the complaint, the report of Receiver Greeley, on the 7th of June, and the order of the court of that date, it is apparent that the Florida Central Railroad Company was a defendant in the L'Engle suit, and that

the suit was by a stockholder in the Jacksonville, Pensacola and Mobile Railroad Company, and the Florida Central Railroad Company, seeking the appointment of a Receiver, and that the action was brought upon the hypothesis of no amalgamation of the two roads. It was apparent, from the allegations of the bill, that the matter of consolidation was disputed, both by what assumed to be the company, as well as persons claiming to be *bona fide* stockholders. This company was itself named a defendant in the complaint. What was the case made by the complaint? The prayer of the original complaint was for a simple judgment against the Jacksonville, Pensacola and Mobile Railroad Company for a Receiver of the road and of the stock of the two companies, with power to vote the stock, for a sale of the stock, and for an injunction. No relief was prayed in behalf of the State of Florida. The prayer of the amended complaint it is difficult to understand. It prayed a sale of the road, the receiver to announce, as conditions of the sale, " that said railroad is sold, subject to the same rights of the Trustees of the Internal Improvement Fund, under said act of 1855, that heretofore existed to enforce the payment to the fund from the said road, as well as what may hereafter fall due, according to the terms of said act of 1855, and upon the condition that the purchaser buys the road subject to the claim of the State of Florida, growing out of the exchange of securities, as fully and amply as though such had not taken place." The most that can be said of this prayer of the complaint, original and supplemental, is, that they pray for judgment in behalf of the trustees, and a sale of the road to satisfy that judgment, and for a Receiver. No judgment or relief was prayed in behalf of the State. It is a rule of the code that if there be no answer, the relief granted cannot exceed that which is demanded in the complaint, even where the defendant makes no defence. In this case, the State, in the absence of an answer, would have been entitled to no decree ; and in the absence of an answer, no order

should have been passed by the court, in view of the equities of the State, as set forth in the bill, when the State asked no relief, and had apparently made herself a party for no other reason than to show her assent to the action of the trustees. The State having asked no final decree, based upon her equities, could not have a Receiver appointed at her instance, which should only be done to have the property in the custody of the law, to meet a judgment based upon her equities. Not only is this true of the complaints, original and supplemental, but it is also true that the final judgment entered in this case is in behalf of the trustees, with the exception that it recites that it is decreed, in behalf of the State, that there is a consolidation. And if that is all the decree it sought, this certainly could not justify the appointment of a Receiver. The State, also, in its bill in the Supreme Court of the United States, alleges that this suit was brought " for the purpose of recovering the balance of the purchase money " aforesaid, (that is, the sum due the trustees,) to-wit, " the sum of four hundred and seventy-two thousand dollars, with interest ;" and the amended and original complaints in this action are there filed as exhibits. There are other allegations of the State in its bill in the Supreme Court of the United States which manifest the like purpose, but, as we have said before, it is sufficiently apparent on the face of the original and amended complaints on file on the 22d day of June, A. D. 1872. Assuming, for the purpose of disposing of this question, that there was a lien in behalf of the trustees, to the extent of the first mortgage bond debt of the Pensacola and Georgia Railroad Company, it is very clear that this lien did not extend beyond the line of the former Pensacola and Georgia Railroad. A mortgagee cannot be said to have any equitable rights looking to receivership in the property of the mortgagor, beyond that included in the mortgage. Whether there was consolidation or not, the lien of the trustees did not extend beyond the property embraced in the mortgage ; and the road from Lake City to

Jacksonville was not therein. The complaint claims no balance of purchase money as due from the purchasers of the road at the sale under the act of January 6, 1855, and only states that such purchasers have not complied with the condition of the sale as to continuing the payment of the sinking fund upon the outstanding bonds. It fails to state what amount of bonds are outstanding, and only states that the total amount due the sinking fund by the purchasers of the several roads was about thirteen thousand five hundred dollars. What portion of this was due by the purchasers of this line of road is nowhere stated. The act of January 6, 1855, provided that these purchasers should be bound to continue the payment of the sinking fund, under the penalty of an annulment of the contract of purchase, and the forfeiture of the purchase money paid in. The allegations of the complaint are so uncertain and indefinite as to this matter, as to give no amount as due by these purchasers. Granting, for the purpose of disposing of this question, that this penalty and forfeiture might have been enforced at the hearing in the event the proof sustained these allegations, still we cannot see that it was either necessary or expedient for the court to take possession of this property, and appoint a manager of a line of railway in the meantime, or that such injury was to be apprehended by a short delay as justified the court in dispensing with notice to the parties defendant. " As a general rule, a Receiver should not be appointed without notice to the opposite party." Formerly, the practice was not to appoint before answer. Except under very exceptional circumstances, an application for a Receiver should not be considered when made without notice. A case of great urgency should be made to appear. (Kerr on Receivers, 137 and citations.) In this case, the appointment of Greeley over Baker was contrary to the general rule; and as it appeared on the face of the complaint that the Florida Central Railroad Company claimed to own this property, we think it was an improper exercise of discretion

by the court to make such an appointment with or without
notice to it, and especially is this true in the light of the or-
der of June 7, in this case, from which it appears that this
line of road was at that time in possession of the agents and
employees of the Florida Central Railroad Company, with
directions to pay the earnings thereof to the Receiver Ba-
ker, and Receiver Baker is called in the complaint a Re-
ceiver of the " earnings " of this road.   It is our conclusion
that the case made by the complaint, considered in connec-
tion with the last action of the court in this case on the 7th
of June, and of the proceedings then before the court, so far
as they appeared in this record at that time, did not justify
the appointment of a Receiver as against the Florida Cen-
tral Railroad Company, and that there is no sufficient reason
disclosed in this record for the removal of Baker, *the* Re-
ceiver of the " earnings " of the Florida Central Railroad
Company, and the appointment of Greeley, as manager of
the road, as distinct from a Receiver of its tolls.

Having thus disposed of the question of receivership, as to
this line of road, we consider the question in reference to de-
fendant, D. P. Holland.   Subsequent to the appointment of
Greeley Receiver, by the Circuit Court of Duval county,
and in May, A. D. 1873, Holland sold the equity of redemp-
tion and all the interest of the Jacksonville, Pensacola and
Mobile Railroad Company, in the line of railway from Lake
City to Quincy, and from Tallahassee to St. Marks, under
an execution issued upon a judgment before that time ob-
tained by him against this company in the Circuit Court of
the United States for the Northern District of Florida.

At this sale he became the purchaser, and credited the
amount of his bid on the execution.  About this time holders
of first mortgage bonds of the Pensacola and Georgia Rail-
road Company instituted a suit in the Circuit Court for the
Second Judicial Circuit of Florida, and F. B. Papy was ap-
pointed by that court Receiver of the line of road west of
Lake City. In July, 1872, other first mortgage bondholders

filed a bill in .the Circuit Court of the United States, Northern District of Florida, against the Jacksonville, Pensacola and Mobile 'Railroad Company and the trustees. In this suit in December, A. D. 1872, the Jacksonville, Pensacola and Mobile Railroad Company, withdrawing its answer, and the suit being dismissed as to the trustees, a decree *pro confesso* was taken against the Jacksonville, Pensacola and Mobile Railroad Company. Papy, under an agreement between the parties, was then dismissed as Receiver.

On the 19th of December, the marshal levied his decree on property west of Lake City, and advertised it for sale on the 7th of July, A. D. 1873. The sale was postponed to January 1, A. D. 1874. After the sale to Holland, and this postponement, Holland remained in possession. The State of Florida, in its own right, and in right of the trustees, filed an original bill in the Supreme Court of the United States, setting up the exchange of securities between it and the railroad companies, alleging that there was a balance of purchase money due the trustees under the original sale, as well as a large amount of interest due the State on the bonds of the Jacksonville, Pensacola and Mobile Railroad Company, stating the before-mentioned proceedings in the courts of the State and the United States in Florida, and praying *inter alia* for injunction against the marshal, the plaintiffs in the suits in the United States Courts, and for an order to deliver possession to Receiver Greeley, or, in lieu thereof, that the Supreme Court of the United States appoint a Receiver for all the property *west of Lake City*. Upon motion for the appointment of a Receiver after notice, the Supreme Court directed Holland to report his future and past receipts from the road in his possession. With Holland thus in possession, the Circuit Court of Duval county, in this case, ordered him to surrender this possession to Receiver Greeley, enjoined him from any further intermeddling with the possession, and under a writ directed to all and singular the sheriffs of the State, he was dispossessed.

and Greeley was put in actual possession of the road west of Lake City. Holland now seeks a reversal of these orders, one of the grounds being, that there is no jurisdiction in the Circuit Court of Duval county thus to take into its custody property beyond the territorial limits of the circuit.

This is a question of great importance, and in view of the conflict of jurisdiction between the second and fourth judicial circuits in this case, it should be settled. Under the constitution, this State is divided into seven judicial districts, and "the Circuit Courts in the several judicial circuits" are invested with general original jurisdiction in law and equity. There is no legislation which authorizes the appointment of a receiver of property which is beyond the territorial limits of the circuits. Under these circumstances we can reach no other conclusion than that no such appointment can be made effectively; and that the Circuit Court, in all of its orders in this case, appointing a receiver of property beyond its limits, went beyond its authority. In the language of Mr. Justice Story, in Picquet vs. Swann, 5 Mason, 40—"This results from the general principle that a court created within and for a particular territory is bounded in the exercise of its powers by the limits of such territory. It matters not whether it be a Kingdom, a State, a county, or a city, or other local district. If it be the former, it is necessarily bounded and limited by the sovereignty of the government itself, which cannot be extra territorial; if the latter, then the judicial interpretation is that the sovereign has chosen to assign this special limit short of his general authority." It is a general principle of the common law that no writ or process can run or be executed beyond the territorial jurisdiction of the court out of which it issues; and independent of legislation, there can be no doubt that the Circuit Court of one circuit cannot through ist receiver take possession of property in another circuit. There is no such legislation in this State, and we doubt very much whether such legislation would not be in conflict with the

constitution, but that question is not here involved. In Galpin *vs.* Payne, 18 How., 367, the Supreme Court of the United States uses this language: " The authority of every judicial tribunal and the obligation to obey it, says Burge, in his Commentaries, are circumscribed by the limits of the territory in which it is established." Under the Constitution of Arkansas, in A. D. 1839, the Circuit Court organization was similar to that existing under the present Constitution of Florida. The Supreme Court of that State, (2 Ark., 503,) speaking of this organization, says: " The constitution has distributed the State into a given number of separate and independent circuits, has required a judge to be elected for each of these circuits; whose power and authority is restricted and limited to the prescribed and ascertained boundaries · of his particular district. The constitution has furthermore established a Circuit Court in each county of the State, and it has fixed and confined its territorial jurisdiction within the boundaries thereof. No writ or process, according to the common law, can run or be executed beyond the limits of the territorial jurisdiction of the court out of which it issues ; and it is clear that the court of one county cannot run its writs or process within the boundaries or limits of another county without some legislation on the subject. What class of cases and for what purposes the Legislature may authorize the Circuit Court of one county to run its writs and have the same executed within the boundaries or limits of another, is a question of some nicety." (4 Mon., 437–8 ; 2 B. Mon., 203 ; 4 J. J. Mar., 407–8–9 ; 1 Dana, 109 ; 2 Bibb, 445 ; 1 ib., 410 ; 1 Ind., 1 ; 1 Scam., 404.) We do not question the power of a court of equity to require a defendant, within its jurisdiction, to perform any act or do anything in reference to property in another jurisdiction or foreign State. We simply say that a Circuit Court in the State of Florida, under our constitution and laws, cannot by its officer take possession of property beyond its territorial jurisdiction.

We leave this subject with these general remarks. The appointment of a receiver, with directions to take possession of and manage a line of railway—in other words a manager, is an extraordinary exercise of power. In the case of Gardner *vs.* The London, Chatham and Dover Railway Company, (2 Law Reports, Ch. Appeals, 201,) Lord Cairns says that a court of chancery will not appoint a manager of a railway company. This he puts upon the ground that the company is in the exercise of powers and the discharge of duties and responsibilities confided exclusively to the persons composing the company, and the court should not by its action, without any parliamentary authority, make itself and its officers the hand to execute these powers and public duties. This rule has been modified in the United States. (18 Grattan, 828; 99 Mass., 395; 38 Ver., 408; 6 C. E. Green, 298.) Under the statutes of many of the States (this State among the number,) a receiver of a line of railway is under some circumstances authorized. As a general rule, we do not hesitate to say that a very strong case should be presented before a court should resort to a remedy so extreme, and with reference to the management of the road, so revolutionary in its character. We can hardly imagine a case where it should be done without notice. The road is local, and cannot be taken beyond the jurisdiction and control of the court, and in many cases an injunction or restraining order will accomplish all that is necessary to protect the rights of plaintiffs.

This cause coming on to be heard upon the three separate appeals, taken at different stages of the cause, the defendant, the Florida Central Railroad Company, being the appellant in the first appeal, and the said Florida Central Railroad Company, Edward M. L'Engle, Daniel P. Holland, and James Hunter, being appellants in the second appeal, and said Edward M. L'Engle, Francis B. Papy, George R. Foster, Francis F. L'Engle, and Theodore Hartridge, being appellants in the third appeal, said appellants being defend-

ants at the time of taking their appeals, and the questions involved in said appeals having been argued and submitted together by the counsel for the different appellants and the respondents, and the court being advised of its opinion in the premises, and wishing to dispose of all the questions raised by said appeals, it is therefore ordered, considered, and adjudged by the court that the judgment of the Circuit Court of Duval county, rendered in this case on the second day of April, A. D. eighteen hundred and seventy-four, and the order of the thirteenth day of April, A. D. eighteen hundred and seventy-four, be and the same are reversed and set aside and vacated, and that all and every order made in said cause, appointing or continuing a receiver in this cause, and all orders consequent upon the same, and all orders restraining the appellants or any of them, or granting or continuing any injunction against the appellants or any of them, except in so far as any of said appellants are restrained or enjoined from disposing of stock in the alleged Florida Central Railroad Company, be and the same are reversed, set aside, and vacated. And it is further considered that the case, including the three appeals, be remanded to the Circuit Court of Duval county, there to stand for hearing upon the issues made, or to be made by the pleadings, or for such other disposition as is comformable to law, and not inconsistent with the opinion filed in these appeals.

BRYSON dissenting:

I am unable to agree with that part of the opinion in this case, "that the Circuit Court, as a court of equity, has no jurisdiction beyond the territorial limits of its circuit," and as it is remarked by Justice Westcott in the opinion, "this is a question of great importance," I will state my reasons in as brief a manner as possible. The case in 18 Wallace, 350, relied upon by the appellant in this case, has reference to the jurisdiction of a court of law, and a judgment of a court of law, and it is only necessary to refer to the case of

Picquet vs. Swann, 5 Mason, 40, to show that it had refer-
ence to a court of law, where Mr. Story uses this language:
" Even the Court of King's Bench in England, though a
court of general jurisdiction, never imagined that it could
serve process in Scotland, Ireland or the Colonies." This is
certainly true, and it is equally as true that the Court of
King's Bench is a court of common law, and never had any
equity or chancery jurisdiction. The same remark will ap-
ply to the jurisdiction of county courts in this State. They
are courts of limited jurisdiction, and have no equity or
chancery jurisdiction or power whatever, and are confined
to the county. But it cannot be denied that the courts of
equity, both in England and America, have exercised juris-
diction outside of their territorial limits for a considerable
length of time; in fact we find them exercising this jurisdic-
tion almost from their creation. In 2 Daniel's Chancery
practice, "It is not necessary in order to authorize the
court to make an order for a Receiver that the property in
respect to which he is to be appointed should be in England.
A Receiver will be appointed here of property in the East
Indies, in which case the Receiver must find sureties who
are residents in England." 2 S. and S., 453. " A Receiver
may also be appointed of estates in Ireland, but it seems
that in such cases the recognizance of the record and his
securities entered into and enrolled in that country." 2
Daniel's Ch. practice, 1425. " It may also be mentioned
that officers, in the nature of Receivers, are frequently ap-
pointed of plantations in the West Indies, but as a planta-
tion in the West Indies partakes in some measure of the
nature of a manufactory or trade, instead of a Receiver, the
person appointed is usually called a manager." 2 Daniels,
1424.

Kerr on Receivers at page 259 : " When the suit relates
to property abroad, or in the colonies which partakes of the
nature of a trade, it is competent for the court to appoint a
manager." Referring to L. R., 2 Ch., and pp. 212, 213, " the

manager is appointed in such cases, not for the purpose of carrying on the trade, but to enable the court to give relief when the cause shall be heard, referring to Waters vs. Taylor, 15 Ves., 25 per Lord Elden ; Shepherd vs. Oxenford, 1 K. and J., 500." "Persons, for instance, have been appointed to manage landed property, to receive the rents and profits, and convert, get in and remit the proceeds of property and assetts, when such property has been situated in India, the West Indies, Demarara and the Brazils." Kerr on Rec., 260. "In conclusion," says Mr. Daniel, 2 Vol., E., 1449, "it may be mentioned that the term manager or consignee, as distinguished from receiver, is sometimes used with respect to certain descriptions of property, as mines, collieries, or West India estates. There does not seem to be any substantial difference in the practice with respect to the officers thus designated, and by the interpretation clause of the order of the 16th of October, 1852, the word Receiver includes consignee and manager. It does not appear that this distinction has been made in this country, but that the order designates the duties of that officer. Then it clearly appears that in England a Receiver may be appointed over property outside the jurisdiction of the court. In this country it will be seen that the practice is not so uniform, but it will be seen that the principle is recognized by most of the States. It will appear by reference to the case of Booth vs. Clarke, 17 How., 322, the Supreme Court of the United States holds, that a Receiver appointed in the First Circuit of the State of New York could sue for and receive property outside of the State. The court in that case uses this language on page 536, condensed reports : " No attempt was made, according to the chancery practice, to cause Clarke, by the attachment of his person under the injunction, to make an assignment of that claim for the payment of Camara's judgment." " It cannot be said that Clarke had no property to assign, and that it was, therefore, unnecessary to attach him. That would make no difference, for

whether with or without property he might have been compelled to make a general assignment, even though he had sworn that he had none." It was so ruled in Chipman vs. Sabbatton, 7 Paige C. R., 47, and in Fitsburgh vs. Everingham, 6 Paige, 29." "There was a want of vigilance in this matter which does not make any equity which he may have in New York upon Clark's property superior to that of Clark's creditors, who are pursuing the funds in this district;" clearly showing that if the proper proceedings had been had the Receiver might have maintained his action, for the effects claimed in that suit, outside of the State of New York, not merely outside the jurisdiction of the territorial limits of the First Judicial Circuit. "When the appointment of a Receiver has been perfected by filing of the report and security, the title to the personal property, covered by the Receivership, vests in the Receiver without any assignment or transfer from the person in possession." 9 New York R., 142. "But that is not so with the real property. That passes by force of the debtor's own conveyance, which the court has power to compell him to execute." 19 New York R., 369 ; Thompson on Provisional Remedies, 480. It was held in Mitchell vs. Bunch, 2 Paige R., 615, that a Receiver might be appointed over property outside of the jurisdiction of the court. That, "although the property of the defendant is beyond the territorial reach of the court, so that it can neither be sequestrated, nor taken in execution, the court does not lose its jurisdiction to that property, provided the person of the defendant is within the jurisdiction." "By the ordinary proceedings, the defendant may be compelled either to bring the property in dispute, or to which the complainant claims an equitable title, within the jurisdiction of the court, or execute such a conveyance or transfer thereof as will be sufficient to vest the legal title as well as the possession of the property, according to the *lex loci rei sitæ*;" the identical mode indicated by the Supreme Court of the United States

in 17 How., 332.    It will be seen that the same principles
are laid down in Daniels Ch. Practice, 2 Vol., 1045, 1046,
and the same doctrine is more fully set forth in Story's
Equity Jurisprudence, 743-4. "The proposition may, there-
fore, be laid down in the most general form, that to entitle
a court of equity to maintain a bill for the specific perform-
ance of a contract respecting land, it is not necessary that
the land should be situated within the jurisdiction of the
State or country where the suit is brought," says Mr. Story,
and with all his ingenuity and talent for research, he was
only able to find two cases in this country where a contrary
ruling had been made, and both of these were governed by
peculiar circumstances surrounding them.   "The case in
Pennsylvania it was decided that the court had no jurisdic-
tion over a bill praying for an injunction against the defend-
ant residing in another county, but who was temporarily
within the jurisdiction of the court, for erecting a nuisance
which injured the plaintiffs' land in that county; for to
give complete remedy in such a case, a court must not only
restrain and prevent a continuance of the nuisance, but must
order its removal and give compensation in damages for the
injury already caused, and for a court of equity to give this
ample relief, the *locus in quo* must be within the absolute
jurisdiction of the court."   1 Parson's Eq. R., 387.    The
case in North Carolina referred to—it appears that one of
the joint executors resided in the State of Tennessee, and
that the lands and those having the legal title to the same
were in Tennessee, and only one of the executors before the
court. It was fully admitted by defendants' counsel and held
by the court, that where either the person or the subject
matter of the suit was within the jurisdiction of the court,
that the court had jurisdiction of the whole.

It appears from the pleadings that this suit was commenced
under the Code, and that the statute repealing the Code uses
this language: "Section 11. That all suits already com-
menced, and all pleadings already in, shall not be affected

by any of the provisions of this act, but shall be proceeded in as if the act had not passed." Act 1872, p. 18. It appears from the act that the jurisdiction of the court is not diminished. See Sec. 192. A Receiver may be appointed, first, before judgment, on the application of either party, when he establishes an apparent right to the property which is the subject of the action, and which is in the possession of an adverse party, and the property or its rents and profits are in danger of being lost, or materially injured or impaired, except in cases where judgment upon failure may be had without application to the court.

Mr. Thompson, in his work on Provisional Remedies, after copying the section, of which our Code is an exact copy, says: "This section bears upon its face unmistakable evidence of a determination by the Legislature in its enactment between actions at law and suits in equity. The first and second branches of the section plainly apply to the latter class of actions exclusively, while the third is clearly intended to apply to actions at law, and is, therefore, an obvious enlargement of the power of the court to enjoin. The first two clauses are, in substance, a mere embodiment of the established equity principles as they existed before the Code, and cannot be construed to create new rights of action or give new remedies; nor are they, in any sense, an abridgement of the former jurisdiction of the court." "The provisional injunction allowed by this section may be granted in every case where a temporary injunction would have been proper under the former practice." Thompson on Provisional Remedies, p. 204, § 2. And he refers to the case of Rawlins against Joel, 13 N. Y., 488. Again the same author says, "that every kind of property of such a nature that if, if legal, it might be taken in execution, may be, if equitable, put into the possession of a Receiver; and here the appointment of such a person has been said to be an equitable execution," (page 483,) and referring to Edwards on Receivers in Equity, under the former practice, p. 6. "If the property

is in the possession of a third person, claiming a right to retain it, the Receiver can proceed by suit against such person in the ordinary way, and thus try the right, or the plaintiff may amend his complaint, making such third person a party, and the receivership extended to the property in his hands, so that the order for the delivery of the property may be binding upon him, and be enforced, if necessary, by process of contempt." Thompson on Provisional Remedies, 483, referring to 8 Paige's Reports, 390. Then it clearly appears that the powers of the court under the Code have not been abridged or made less. It appears from the pleadings in this suit that it is brought by the State of Florida and the Trustees of the Internal Improvement Fund against the Jacksonville, Pensacola and Mobile Railroad Company, a corporation created by the laws of Florida, authorizing it to construct a line of railway from Quincy, west, to the Alabama line, with the privilege of extending it to Mobile, Alabama. The act also authorizes said company to consolidate with any road, or part of road, completed from Quincy to Jacksonville, and to operate the whole line of railway from Jacksonville to Quincy, by consolidation or otherwise. The act, as amended, authorizes the Governor of the State to deliver to the President of the Jacksonville, Pensacola and Mobile Railroad Company the bonds of the State for all the road completed and in good running order, in exchange for the like amount of bonds of the Jacksonville, Pensacola and Mobile Railroad Company, which bonds are to be a statutory lien upon the road and all its property. That the bonds of the State had been issued and delivered to the President of the Jacksonville, Pensacola and Mobile Railroad Company to the amount of four million dollars, and as the same amount of bonds had been issued by said company and delivered to the State by the President of said company, but that one million of dollars of the bonds so issued by the State were payable to the Florida Central Railroad Company, and the same amount of bonds delivered to the State

by the President of the Jacksonville, Pensacola and Mobile Railroad Company, were issued by and under the seal of the Florida Central Railroad Company; that the Florida Central Railroad formed part of the line of railway from Jacksonville to Quincy; that the whole line of road from Jacksonville to Chattahoochee was in possession of the Jacksonville, Pensacola and Mobile Railroad Company; that its principal office was in Jacksonville; that all the business of the corporation was transacted at that office; that at the commencement of this suit, Chase, Ambler and Flagg were operating the whole line under a lease from the Jacksonville, Pensacola and Mobile Railroad Company. It appears that this line of railway in operation extends entirely through the second and third circuits, and that about forty-nine miles of the railway, and the principal office, are within the fourth circuit, and all within the State of Florida; that the process had been served upon the President of the Jacksonville, Pensacola and Mobile Railroad Company in the fourth circuit. Then, applying the principles of equity jurisdiction, and the jurisdiction under the Code, heretofore referred to, and the more clear and pointed doctrine declared by the Supreme Court of the United States in 9 How., 390, a court of equity having obtained jurisdiction for one purpose, will proceed to grant full relief. "If the court of equity has jurisdiction of part of the subject matter and the defendant, it may direct a public sale of lands lying out of its territorial jurisdiction, and compel the party to convey." Lyman vs. Lyman, 2 Penn., 11; King vs. Tuscumbia, Courtland and Decatur Railroad Company, 7 L. I., 166. These two last authorities are from the State which Mr. Story relies on. Though equity cannot act directly on the land not within its jurisdiction, it may compel the holder of the title who is a party before the court to give effect to a lien. Lewis vs. Darling, 16 How., 1. Applying these well settled rules, I am compelled to hold that in this case, if a proper case had been made, and the proper proceedings had, that the court

did have jurisdiction of the whole line of road, and did have authority to make any order that was necessary to protect the whole property until the rights of the parties could be determined. The property of the defendant may be sold in any county in the State under an execution issued upon a decree of the court, and it cannot be that a court of equity has not the power to protect any property which may be finally disposed of by it. If a court of equity has not the authority when it has possession of part of the subject matter, and the defendant is before it, to reach any property within the State, then that long arm, which is dwelt on so much by writers on Equity Jurisprudence, and so often used by courts of equity to prevent fraud and injury, has become very short in Florida. Suppose this suit was alone against the Florida Central Railroad Company, when forty-nine miles of that road lie within the territorial limits of the fourth circuit, and only eleven in the third, can it be possible that that court would not have jurisdiction to protect the whole of the property in litigation until the rights of the parties are determined? As the order appointing a Receiver, directing Greeley to take possession, and displacing Holland, was made without notice, and after the plaintiff had filed a bill in another court, making Holland a party, and asking for a Receiver, and that court having continued Holland in possession and amenable to that court, it is certainly without precedent, and for these reasons, the order must be reversed.

The appointing a receiver to run a railroad is certainly a modern invention, and there is certainly nothing in the proceedings in this case that authorizes any such an appointment under any precedent which can be found.

I fully concur with all the other rulings of the court.